Herbert C. DEESEN, Appellant,

v.

The PROFESSIONAL GOLFERS' ASSO-CIATION OF AMERICA, an unincorpo-rated association, et al., Appellees.

No. 19837.

United States Court of Appeals Ninth Circuit.

Feb. 23, 1966.

Rehearing Denied April 4, 1966.

**166**

Arthur H. Tibbits, San Francisco, Cal., Burt S. Hofmann, of Allen, Poggi & Hofmann, Oakland, Cal., for appellant.

Thurman Arnold, John D. Hawke, Jr., of Arnold, Fortas & Porter, Washington, D. C., Dana Murdock, of Tinning & Delap, Richmond, Cal., for appellee.

Before CHAMBERS, HAMLEY and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

Herbert C. Deesen brought this action against The Professional Golfers' Association of America (PGA) and a number of individuals to recover damages and obtain injunctive relief for alleged violations of sections 1 and 2 of the Sherman Act.[1] Damages were claimed in the sum of $70,000, trebled to $210,000. Jurisdiction in the district court was asserted under sections 4 and 16 of the Clayton Act.[2]

In his complaint, as modified by the pretrial orders, Deesen, who is a professional golfer, claimed that PGA and its members have combined and conspired to monopolize the business of tournament golf professionals in violation of section 2 of the Sherman Act. He also claimed that, as evidenced by PGA's rules and regulations governing the eligibility of entrants into PGA sponsored and co-sponsored tournaments, defendants have combined and conspired to restrain, unreasonably, the business of tournament golf professionals, and to boycott plaintiff, in violation of section 1 of the Sherman Act.

After a trial without a jury, judgment was entered for defendants. Plaintiff appeals. In the following paragraphs we summarize the findings of fact entered by the trial court, amplified to include certain undisputed facts stated in the second pretrial order but not carried forward into the findings of fact.

PGA is an association of some 4,300 golfers, founded in 1916 as a voluntary unincorporated non-profit association. The named individual defendants are persons who were, at the time the complaint was filed on April 23, 1959, officers and employees of PGA and members of its tournament committee.

PGA sponsors or co-sponsors substantially all of the professional golf tournaments held in the United States. In order to compete in these golf tournaments, a player must either be a member of PGA, or an approved tournament player, or one of a limited number of participants

1. 26 Stat. 209 (1890), as amended, 15 U.S.C. §§ 1, 2 (1964)

2. 38 Stat. 731, 737 (1914), 15 U.S.C. §§ 15, 26 (1964).

who may be designated or invited by the local sponsor. Because of the increasing popularity of professional tournament golf, the increasing number of golfers, and the increasing number of persons eligible to enter PGA sponsored tournaments, and because the limitations of time and space make it impossible to play a full tournament with a field of more than 150 or 160 golfers, some means had to be found to limit the number of golfers who could enter these tournaments. PGA rules limiting entry to PGA members, approved tournament players and a few others, and defining the qualifications necessary for non-member entrants, were intended to accomplish this purpose.

In order to become a PGA member a person must have five years experience, either in the employ of a golf club as a professional or in the employ of a professional, as an assistant at a golf club, or (in recent years) as a tournament player under an agreement with PGA, playing a minimum of twenty-five tournaments per year, or any combination of these methods for a period of five years. Deesen was at all times, and now is, unwilling to become employed by a golf club as a professional or as an assistant to a professional at a golf club.

An approved tournament player must be approved first by a local committee of PGA, then by PGA's tournament and executive committees. Approval is given if the applicant has, in the opinion of each of these committees: (1) the ability to play golf and finish in the money in tournaments in which he competes, (2) the financial responsibility to undertake the golf tours, and (3) moral character and integrity. There are no issues herein as to Deesen's financial responsibility or his character and integrity.

There are no exact or definite standards set up to determine ability to play. The nature of golf is such that no precise standard of ability can be established other than by comparison of scores and ability to finish in the money in tournaments. In order to enter PGA sponsored and co-sponsored tournaments, PGA members are not required to meet the standards set for PGA-approved tournament players.

Deesen is a professional golfer who was eligible to compete as a PGA-approved tournament player in PGA sponsored and co-sponsored tournaments under contract with PGA from 1952 to 1958.[3] Pursuant to PGA rules and regulations and the tournament player's agreement that Deesen signed, he was required to compete in a minimum of fifteen PGA sponsored tournaments each year and maintain an ability to finish in the money in such tournaments. The requirement of competing in fifteen tournaments a year was later reduced to ten. During this period Deesen was active as a professional golf tournament player, and he placed in the money three times, earning $240.35. Some of his scores were better than some of the PGA members' scores playing in the same tournaments. Deesen's record in PGA tournaments from 1952 through 1958 is shown in the margin.[4]

3. One need not be employed by a golf club in order to be a professional golfer. Additional sources of income of professional golfers are winnings from tournaments, from personal appearances on television, radio and moving pictures, and from the endorsement of golfing equipment and other merchandise.

| 4. Year | Number of Tournaments Entered | Number of Tournaments in Which Qualified | Average Scores | Money Winnings |
|---------|-------------------------------|------------------------------------------|----------------|----------------|
| 1952 | 0 | 0 | .... | 0 |
| 1953 | 5 | 2 | 76.5 –78 | 0 |
| 1954 | 9 | 5 | 76  –85 | $130.00 |
| 1955 | 3 | 1 | 79  –79.5 | 0 |
| 1956 | 10 | 4 | 79.75–82 | $110.35 |
| 1957 | 10 | 0 | 77  –82 | 0 |
| 1958 | 4 | 0 | 76.5 –86 | 0 |

During this time he was otherwise unemployed. However, during part of this period he had a partnership arrangement with his parents to support him while he was thus engaged as a professional golfer. His expenses during the period from 1952 to 1958, were approximately $13,500. In 1958, Deesen sustained an injury which affected his playing ability and prevented him from competing in ten tournaments that year. PGA's tournament field supervisor was informed of this injury prior to September 1, 1958.

PGA sponsors from forty to fifty professional golf tournaments each year, scheduled throughout the nation so as to provide a national tour for golf professionals. The nucleus of the "field" in these tournaments is composed of PGA members and approved tournament players who earn their livelihood by following the tournament circuit. At the present time, over two hundred golfers follow the circuit regularly.

In 1958, PGA's national tournament committee undertook to terminate the approved tournament player status of a number of professional golfers. The committee designated Harvey Raynor, J. Edwin Carter, and Lou Strong, PGA members and employees, to select the players whose contracts were to be terminated. As a result of their recommendations PGA terminated the contracts of fifty-seven professional golfers, including Deesen. His status as an approved tournament player was terminated by PGA on September 1, 1958. This was done on the grounds that his playing ability was not sufficient in the opinion of the PGA tournament committee, and for failure to compete in the requisite number of tournaments.

Prior to the commencement of this action, but after termination of his status as an approved tournament player, Deesen on a number of occasions applied to PGA and its tournament committee for reinstatement. During this period, plaintiff did not compete in professional tournament golf or play on courses altered for professional tournament play. During this same period, Deesen's scores were sometimes around par, sometimes in the seventies and were in some instances between par and seventy-five.

After this action was commenced, Deesen again applied to PGA for reinstatement. Pursuant to an agreement reached between the parties at the first pretrial conference in this case, Deesen played a number of "test" rounds of golf with various professionals in the San Francisco Bay Area. His scores on these rounds ranged from seventy-five to eighty-four and averaged over seventy-eight. On this showing, reinstatement was denied.

On January 14, 1959, Deesen appeared before PGA's national tournament committee, presented evidence of his prior injuries and his playing ability at that time and requested reinstatement. Reinstatement was denied.

On the basis of these facts, the trial court further found as follows: Deesen has not shown that the PGA rules were applied to him in a manner different in any way from that in which they were applied to any other approved tournament player or non-member of PGA. The fact that members are entitled to play in PGA sponsored and co-sponsored tournaments without the qualifications required of non-PGA members is not an improper discrimination since membership in PGA is open to all persons on the same conditions.

The district court also found: Deesen has failed to prove the existence of any agreement, combination, or conspiracy entered into for the specific purpose of keeping him personally out of PGA tournaments or for preventing him from making a living as a professional golfer. The evidence shows that admission to the status of an approved tournament player is and has always been open to all persons on the same terms. PGA has not excluded Deesen and other non-PGA members from tournament golf play in an arbitrary and unreasonable manner. The evidence does not establish that Deesen possessed such ability as a golfer that it is unreasonable to bar him from entering PGA tournaments. Deesen has suffered no financial loss as a result of not having

been permitted to play in PGA sponsored or co-sponsored tournaments.

On these findings, the trial court concluded that Deesen had not established any violation of sections 1 or 2 of the Sherman Act.

■ Deesen first argues that the trial court erred in not carrying forward into its findings of fact certain undisputed facts, favorable to Deesen, stated in the second pretrial order. We have included these omitted recitals in the above résumé of the findings of fact. If the findings as so amplified, support the conclusions of law, then the failure to include these undisputed facts in the formal findings was not prejudicial error.

Deesen next contends that the trial court erred in denying his motion to amend the findings of fact and to make additional findings.

■ We have examined the proposed amendments and additions to the findings. Some of them are, in effect, already incorporated in the formal findings or in the additions thereto which we have inserted in the above résumé. Others appear to be broader than the testimony relied upon would warrant, or they are concerned with details of the evidence which need not be reflected in the findings. We find no error in regard to these matters.

Deesen argues, in effect, that under the established facts it must be held that PGA's rules and regulations concerning eligibility to participate in PGA sponsored tournaments are unreasonable restraints in violation of section 1 of the Sherman Act.

In support of this position appellant first contends that PGA rules and regula-

tions are so indefinite as to be incapable of non-discriminatory enforcement and are thus unreasonable. Deesen attacks the method of processing applications for standing as an approved PGA tournament player. Pointing to the fact that such applications must receive the approval of a local PGA section, the sectional executive committee and the national tournament committee, Deesen argues that the standards applied are inadequate and are in any event subject to being disregarded in favor of personal bias.

Such applications must first be approved by the local section of PGA, where the applicant resides.[5] A local section consists of several members selected to handle such administrative affairs. Each applicant is interviewed by the local section; such matters as character and general reputation are considered.[6] The local section also requires each applicant to play two test rounds with members of the section. There is no requirement that the applicant make a certain score, and the test rounds of themselves are not conclusive. General playing ability and ability to play in a way which will enable the player to maintain himself while on the tour, are considered.

Deesen argues that the personal dislike of just one member of a local section could result in denial of an application. However, no evidence has been called to our attention indicating that an individual member can control the action of a local section, or that applications are ever denied because of personal dislike unassociated with the standards referred to above.

In general the same standards are applied by the sectional executive committee and the national tournament committee,

---

5. The application must be signed by two class "A" members of the local section.

6. Under PGA rules, each applicant must furnish evidence that he has sufficient ability to finish in the money in tournaments in which he competes, his lowest reported scores and the courses at which they were made, his average score, his reasons for wishing to enter into a tournament player's agreement, and letters in the nature of references which certify to his past achievements. He must also furnish evidence that he has insurance which covers him for personal legal liability which may arise out of or be occasioned by accidents involving him which may occur in the course of a tournament in minimum amounts of $100,000 for each person and $300,000 for each accident, together with assurance of his financial ability to support himself while participating in PGA tournaments.

based on the results of the local section's inquiry and test rounds. Deesen argues, in effect, that these latter committees have uncontrolled discretion to deny applications for personal reasons entirely disassociated from the indicated standards. But, again, appellant does not call attention to any evidence which the trial court was required to accept, indicating that these top committees have discriminated against applicants on such a basis. It is true that Deesen testified, in effect, that he had been discriminated against in connection with his applications for reinstatement, but the trial court was not required to accept his appraisal of PGA's motivation.

■ The basic purpose of PGA in requiring persons who seek approved tournament standing to meet certain standards and obtain committee approval appears to be a reasonable one, insofar as the evidence before us indicates. That purpose is to insure that professional golf tournaments are not bogged down with great numbers of players of inferior ability. The purpose is thus not to destroy competition but to foster it by maintaining a high quality of competition.

■ The means PGA has chosen to accomplish this purpose also appear to be reasonable insofar as this record reveals, having in view the national scope of the activity and the practical problems which had to be met. The trial court did not err in holding that, in these respects, Deesen did not establish a violation of section 1 of the Sherman Act.

Deesen also attacks the PGA tournament entry rules on the additional ground that they are not applied uniformly to members and non-members, asserting that the rules are therefore unreasonable on their face. Appellant's specific grievance here is that a PGA member may play in any PGA tournament regardless of his average score, or his ability to finance himself, or the number of tournaments entered, or his ability to finish in the money regularly. Non-PGA members, on the other hand, may not play unless they obtain standing as PGA tournament

approved players in accordance with the standards outlined above.

PGA's tournament program was originated in the 1930's for the primary purpose of promoting public interest in golf and of giving PGA members an opportunity to improve their skills through active competition. PGA felt, and the record does not negate this, that the welfare of club professionals has a direct relationship to the extent of public interest and participation in the game.

It was soon determined that non-member professionals who had the ability to make a good showing in tournament play should also be permitted to engage in PGA sponsored tournaments. But this was not intended to undermine the initial purpose of giving PGA members this tournament outlet. The problem was solved by permitting anyone to join PGA on equal terms with every other member, and by setting up special requirements for non-PGA members who wished to participate in tournament play.

In Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, the Supreme Court said:

"The true test of legality is whether the restraint imposed is such as merely regulates and thereby perhaps promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts."

■ Measured by the test spelled out in Chicago Board of Trade v. United States, the indicated differentiation between PGA and non-PGA members with regard to the right to participate in

sponsored tournaments was not, on this record, shown to be for the purpose of suppressing or destroying competition, nor did it have that effect. The trial court did not err in so ruling.

Deesen contends that the trial court erred in failing to hold that PGA and its members have monopolized the business of tournament golf professionals in violation of section 2 of the Sherman Act.

Appellant premises this argument on three assertions of fact: (1) PGA sponsors and co-sponsors substantially all professional golf tournaments in the United States; [7] (2) to compete in these tournaments a player must either be a member of PGA or a PGA approved tournament player; [8] and (3) PGA has the power to exclude any applicant for participation in these tournaments for any reason whatsoever. Appellant states that, in view of these asserted facts, appellees have monopolized the business of tournament golf professionals in violation of section 2 of the Sherman Act.

The last of these assertions of fact is critical to Deesen's argument, but as worded, it is inconclusive. It is true that generally speaking, any association that undertakes to sponsor a contest of any kind has power to exclude any applicant from participation for any reason whatsoever, unless such power is curtailed by operation of law. The pertinent inquiry, however, is whether an association intends to use that power in a manner which tends to suppress or destroy competition.

Mere size, unaccompanied by unlawful intent or conduct in the exercise of the power gained through size, does not constitute a violation of section 2 of the Sherman Act. United States v. Swift & Co., 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999. It is the existence of

monopoly power coupled with the intent to use it for anticompetitive purposes or with inevitable anticompetitive effects that establishes the offense of monopolization. United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236.

No finding nor evidence has been called to our attention which indicates that PGA has used, or intends to use, its position as the sponsor or co-sponsor of a substantial number of tournaments to preclude sponsorship of tournaments by others, to exclude golfers from access to PGA sponsored tournaments, or to suppress or eliminate competition in professional tournament golf.

According to the evidence before us, PGA's creation of the category of approved tournament player tends to promote competition by facilitating participation by proficient younger players. According to the evidence, PGA has also sought to stimulate competition by giving official recognition to many tournaments which it neither sponsors nor co-sponsors. These "approved tournaments" are free from any PGA control, yet PGA plans its schedule around them and counts them in determining its official standings.

Speaking only with regard to the evidence of record in this case, we hold that the trial court did not err in finding and concluding that PGA did not use its power in a way which is violative of section 2 of the Sherman Act.

Finally, Deesen argues that PGA and its members have combined and conspired to monopolize the business of tournament golf professionals and to boycott and exclude Deesen therefrom in violation of sections 1 and 2 of the Sherman Act.

Under this heading, appellant shifts his attack from the charge of actual

---

7. PGA does not sponsor the U.S. Open Championship, Western Open Championship, Masters Tournament, and two or three other major tournaments.

8. Local sponsors are also permitted to designate a limited number of participants.

monopolization, boycott and restraint to an accusation that PGA has at least combined and conspired to accomplish those results.

Granting that not only actual monopolization and restraint is condemned by the Sherman Act, but also combinations and conspiracies intended to bring about those results, the established facts of this case support one charge no more than the other.

With particular reference to the boycott charge, Deesen's tournament record over a period of several years provided an ample basis for the striking of his name from the list of approved tournament players. Similarly, his showing made during the test rounds arranged after this action was commenced warranted PGA in denying reinstatement to that list. Deesen could still engage in such tournaments if he chose to become a golf teacher employed by a golf club.

■ PGA is entitled to adopt reasonable measures for holding the tournaments to a manageable number.[9] It was required to treat Deesen as well as it treated others in the same category but it was not compelled to give him special treatment merely because he did not wish to accept PGA tournament entry rules and regulations.

■ The district court did not err in holding, on the established facts of this case, that appellees did not conspire and combine to monopolize, boycott and restrain business in violation of sections 1 and 2 of the Sherman Act.

In view of our conclusions, as stated above, it is unnecessary to consider the arguments of the parties directed to the question of monetary damages and injunctive relief.

Affirmed.

9. At the present time approximately 230 professional golfers follow the tour and regularly enter PGA tournaments. Some seventy of these are PGA members, and the remaining 160 are approved tournament players. Pre-qualifying is generally necessary when there are more than 150 entrants in the tournament. The basic reason for this restriction to 150 tournament players is that only a limited number of golfers can play an eighteen-hole course under tournament conditions during the daylight hours of a single day.