Melvin E. HATLEY, Plaintiff-Appellee Cross-Appellant,

v.

The AMERICAN QUARTER HORSE AS-SOCIATION et al., Defendants-Appel-lants Cross-Appellees.

No. 76–2199.

United States Court of Appeals, Fifth Circuit.

May 19, 1977.

R. A. Wilson, D. Barry Stone, Amarillo, Tex., for defendants-appellants cross-appellees.

Norman Darwin, Fort Worth, Tex., amicus curiae, for American Paint Horse Assoc.

Michael Paul Kirschner, Oklahoma City, Okl., A. B. Hankins, Amarillo, Tex., for plaintiff-appellee cross-appellant.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

**INGRAHAM, Circuit Judge:**

Melvin E. Hatley owned some magnificent horseflesh, including a stallion named Mr. Jet Moore and a mare named Chickamona. Both animals were registered with the American Quarter Horse Association (AQHA or "the Association").[1] Although Mr. Jet Moore died after only one season at stud, he sired numerous foals, including a 1974 colt out of Chickamona. Hatley applied to the AQHA for registration of the colt under the name Naturally High. The Association refused to register the colt, citing excessive white markings which indicated that the colt was a paint horse rather than a quarter horse. Hatley's suit for antitrust violations followed.[2] The suit was transferred under 28 U.S.C. § 1404(a)[3] from the Western District of Oklahoma to the Northern District of Texas. Hatley thereupon appended a Texas law due process claim to the complaint. Trial to the court resulted in judgment for defendants[4] on

---

1. Mr. Jet Moore was registered as No. 606,940. Chickamona was registered as No. 352,222.

2. Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

 Section 16 of the Clayton Act, 15 U.S.C. § 26, provides in pertinent part:

 "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . ."

 Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in pertinent part:

 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

 Section 2 of the Sherman Act, 15 U.S.C. § 2, provides:

 "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

3. 28 U.S.C. § 1404(a) provides:

 "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

 The headquarters of the AQHA are in the Northern District of Texas.

4. Hatley's complaint named the following defendants: The AQHA, Clarence Scharbauer, Jr., Robert H. Kieckhefer, Albert C. Becker, Bill Reed, David M. Perkins, Don Jones and James

the antitrust claim. Although he lost the antitrust battle for attorney's fees, plaintiff prevailed in the registration war on the Texas due process issue. The district court ruled for plaintiff because the AQHA afforded no hearing on the question of "excessive" white markings. Defendants were enjoined from refusing to register Naturally High. Both parties appealed the adverse portions of the decision. We affirm on the antitrust claim but reverse and remand in part on the Texas due process claim.

The quarter horse is a popular breed in the United States. It is distinguished from other horses by performance, conformation and coloring. This type is renowned for speed over short distances such as the quarter mile, hence its name. The quarter horse is generally a solid color except for occasional white on the lower legs and part of the face.[5] Aficionados have sought to promote the breed and, not incidentally, to profit therefrom. Races and shows offer lucrative prize money. Selective breeding has become an art and a science. Champion stallions command high stud fees and successful mares are prized by stables.

Mr. Jet Moore was a champion. He won over $340,000 in racing purses and in 1972 was named World Champion Running Horse by the AQHA. Chickamona won $110,000 in racing purses. In an industry where pedigree is carefully scrutinized, it is significant that both horses had ancestors whose records were outstanding.

The AQHA is a non-profit Texas corporation. Its by-laws proclaim that:

"The purpose of this Association shall be to collect, record, and preserve the pedigrees of Quarter Horses, to publish a Stud Book and registry, and to stimulate and regulate any and all other matters such as may pertain to the history, breed-

ing, exhibition, publicity, sale, racing or improvements of this breed."

Official Handbook of the American Quarter Horse Association, Corporation By-Laws, Article I, Section 2. In the thirty-seven years since its creation the Association has been fantastically successful. It has registered over a million quarter horses and has over 50,000 members. Some horses and members are found in all fifty states. The AQHA publishes the Quarter Horse Journal, which keeps members informed of developments in the industry, including the results of AQHA-approved quarter horse shows and membership information such as suspension, expulsions and refusals of admission. Registered quarter horses, equipment, money and AQHA members cross interstate boundaries for the purpose of engaging in the business. The AQHA has ascended to such prominence that:

"Persons organizing shows and rodeos find it necessary to restrict participation to animals on the register of AQHA and to restrict entitlement to show or judge animals shown by others at these shows and rodeos to individuals who have been admitted to membership and are in good standing as a member of AQHA."

*American Quarter Horse Association v. Rose*, 525 S.W.2d 227, 228 (Tex.Civ.App.— Ft. Worth 1975, no writ).

Registration is usually a simple process. The record owner of the foal's dam submits an application, a breeder's certificate and a registration fee. Because coloring and markings aid in distinguishing the quarter horse from less popular breeds, the application provides for a pictorial description of the horse. However, it is sometimes difficult to say precisely where the quarter horse ends and the paint horse begins. The AQHA has had a "white rule" since its creation. This rule codifies the distinction

Goodhue. With the exception of Goodhue, all individual defendants were members of the Executive Committee of the Association. Goodhue was an employee in charge of registration. For convenience, the defending parties will be collectively referred to as "the AQHA," the "Association," or "defendants."

5. These factors distinguish it from pinto, appaloosa and albino horses. The pinto (paint) and appaloosa are different types with distinctive irregular white markings. The American Paint Horse Association does not register appaloosas, and the appaloosa association does not register paints. *Amicus Curiae Brief of American Paint Horse Ass'n* at 3.

between the quarter horse and other members of the equine family. From 1972 through 1975 the white rule (hereinafter styled Rule 92) read as follows:

92. A. No animal having white markings with underlying light skin beyond the following described lines shall be eligible for registration in any section of the Association's official Stud Book. The prescribed lines for white markings with underlying light skin are as follows:

1. White above a line around each leg at the center of the knees and point of the hocks.

2. White behind a line running from the center of each ear to the corner of each side of the mouth; and

3. White on the lower lip above a line running from one corner of the mouth to the other corner. A diagram of these lines of demarcation is shown on page 29.

B. When an animal is a gelding or spayed mare, it may be eligible for registration, having white markings with underlying light skin beyond the lines described in paragraph "A" above, but not constituting excessive white markings with underlying light skin, or having one or more spots of such size, kind, and in such location as to indicate pinto, appaloosa or albino breeding. The registration application for such animal shall be accompanied by a statement from the owner stating such condition of the animal and the date on which the animal was gelded or spayed.

C. In cases of undue hardship, in addition to the provisions of paragraphs A and B above, the Executive Committee shall have the authority to declare eligible for registration a stallion or mare which, in the majority of opinion, is outstanding in conformation and having a sire or dam of outstanding performance or produce, and is worthy of registration though having white markings with underlying light skin beyond the lines described in paragraph A above, but within the standards specified in paragraph B above. An owner who feels he has a just hardship case shall make application and tender a fee of $200 for the purpose of sending two regular field inspectors to examine the horse. The $200 fee shall not be returned regardless of the decision of the Executive Committee. The inspectors' opinions shall be considered by the Executive Committee in acting on the application.

D. When a registration application shows the animal to be registered has white markings beyond the prescribed lines; excessive white markings; or white spot or spots, pictures of the animal shall be required and the animal may be inspected before eligibility of the animal is determined and the application is processed.

E. The registration certificate of any animal having white markings beyond the prescribed lines; excessive white markings, or spot shall be subject to cancellation where the registration application fails to indicate or misrepresents the animal's actual markings.

See Fig. 1. In 1976 the fee for hardship applications was increased to $250. The hardship provision (92C) was added in 1972. Prior to that time horses with white markings beyond the knees, hocks and the boundaries on the face could be registered only if neutered (see 92B). The hardship provision provided an alternative.

Rule 92 is aimed not at the total amount of white markings on the body of the animal, but at the amount of white markings beyond specified areas on the body. Thus, a horse with a few white spots on its flank and a solid chestnut color elsewhere might be denied quarter horse registration while a horse with solid white markings below the knees and hocks would be registered, even though the latter had more square inches of white overall. The word "excessive" is found in both paragraphs 92B and 92C. We agree with the trial court that this word means the same thing in both paragraphs. We emphasize that white markings beyond the boundaries on face and legs (as set out in 92A) are not necessarily "excessive" under 92B and 92C. The AQHA has regis-

tered many horses with white beyond those lines.

When applications for registration arrived at the AQHA office, they were first considered by the Registration Department. If it appeared from the pictorial sketch that the horse had white markings beyond the prescribed areas on the face and legs, the Department requested photographs. After examining the photos, the Office Committee, at the direction of the Executive Committee, would determine which of three reply letters to send to the applicant. The "A" letter informed the applicant that the horse could not be registered even if gelded or spayed because it had excessive white beyond the boundaries established by Rule 92. The "B" letter noted that registration might be allowed if the animal were neutered. The "C" letter noted the possibility of registration if the animal were neutered and added that a hardship application might be appropriate (which, if accepted, would result in registration under 92C without neutering). Hardship registration is preferable to registration under 92B because neutering diminishes the value of the horse. The joy of ownership of a champion is dampened by the knowledge that value for breeding purposes is non-existent. The corollary explains why the AQHA occasionally requires neutering in borderline cases; genes which might taint the breed can be eliminated. Testimony indicated that some paint horses are the product of two quarter horses with recessive paint horse genes.

Hatley's application on behalf of the then unnamed colt was filed in September 1974. Two months later the Association requested additional pictures, particularly "one clear closeup of the inside of the left foreleg." Hatley supplied the photographs. On February 21, 1975, at the direction of the Executive Committee, Jim Goodhue sent Hatley an "A" letter. It read in part:

> ". . . We are unable to register the above-mentioned foal because its white markings are in excess of the white permitted by the rules of this Association. Please note that this decision means the horse is not eligible for registration even if gelded or spayed."

The Executive Committee later reconsidered the application upon Hatley's request and again rejected it.

Although Hatley later filed and then withdrew a hardship application, the "A" letter logically excluded the possibility of a successful hardship application. Only the "C" letter even mentions that alternative.

Of the animals registered as undue hardship cases under 92C, none were superior, and some were inferior, to Naturally High in conformation and pedigree. However, Naturally High has more white hair beyond the prescribed lines than any of the horses registered. Thus an outsider, or even a person familiar with quarter horses and the AQHA, would have been hard pressed to predict with confidence what position the Association would take on Hatley's application. When the Association took the position adverse to his interest, Hatley sought relief in federal court.

### THE ANTITRUST CLAIMS

With respect to plaintiff's Section 1 claim, we find no activities in restraint of trade. Because nearly all economic activity will restrain someone, Section 1 has been read to outlaw only those unreasonable restraints which have been imposed on the industry. *Board of Trade of Chicago v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1917). Initially, judicial inquiry involved an examination of each case upon its own facts, necessitating an evaluation of the proof that defendants had raised prices, curtailed production, or eliminated competition, or that they had attempted to do so. *Compare Maple Flooring Manufacturers Ass'n v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925) with *American Column & Lbr. Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921). The Supreme Court recognized that this tedious and exacting work should not be required in all cases:

> "However, there are certain agreements or practices which because of their pernicious effect on competition and lack of

any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, aff'd, 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457, 668 [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, *International Salt Co. v. United States*, 332 U.S. 392, [68 S.Ct. 12, 92 L.Ed. 20]."

*Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Plaintiff argues that the refusal to register Naturally High is a group boycott and, therefore, illegal *per se*. We reject this contention.

In *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the defendant stock exchange required the termination of direct-wire connections to certain Texas security dealers. These connections were essential to plaintiff's business. The termination was held to violate Section 1, but the *Silver* Court did not hold this particular boycott to be illegal *per se* as might have been expected under *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941),

and *Klor's, Inc. v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Instead it noted that "absent any justification derived from the policy of another statute or *otherwise*," the defendant's action would have been a *per se* violation. 373 U.S. at 348–49, 83 S.Ct. at 1252 (emphasis added). Because the Securities Exchange Act of 1934 established a policy favoring self-regulation, the Court proceeded under the rule of reason and ultimately found the boycott illegal.

The cryptic phrase "or otherwise" has been fastened upon as a signal that a statute is not essential to avoid *per se* treatment of an apparent group boycott.

> "A concerted refusal to deal may, under *Silver*, be validated by a public policy in favor of collective action. Two types of justification may be postulated: those derived from governmental expressions of purpose, and those which result from the need for self-regulation inherent in the industry."

Comment, Trade Association Exclusionary Practices: An Affirmative Role for the Rule of Reason, 66 Colum.L.Rev. 1486, 1499 (1966); *discussed, Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1064–65 (C.D.Cal.1971). Professional sports operations have occasionally benefited from judicial reluctance to apply the *per se* doctrine, although the reasoning may not have been explicit. *See, e. g. Bridge Corp. of America v. American Contract Bridge League, Inc.*, 428 F.2d 1365 (9th Cir. 1970), *cert. denied*, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971); *Deesen v. Professional Golfers' Association*, 358 F.2d 165 (9th Cir.), *cert. denied* 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966).[6]

In an industry which necessarily requires some interdependence and cooperation, the *per se* rule should not be applied indiscriminately. In some sporting enterprises a few rules are essential to survival. The definition of a quarter horse is an inquiry which the AQHA, as a sanctioning organization, ought to be able to pursue. If the inquiry

---

**6.** Excepting only baseball, professional sports are subject to the antitrust laws. *Flood v.* *Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) and cases cited therein.

is anti-competitive, the rule of reason can be utilized to attack it. *Cf. Silver v. New York Stock Exchange, supra.*

Additional support for the rejection of *per se* analysis in this case can be found in *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir. 1972), *cert. denied* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). *McQuade* counsels against taking the path of least resistance in cases where defendants' refusal does not amount to a "naked restraint of trade." 467 F.2d at 187. Analyzing the *per se* cases, *McQuade* found that "the touchstone of per se illegality has been the purpose and effect of the arrangement in question." *Id.* Thus, although the *per se* theory short circuits the exhaustive fact finding required by the rule of reason, it should not be invoked without at least minimal indicia of anti competitive purpose or effect. In this case a preliminary assessment of the industry would have revealed that the minimal indicia were absent. Denial of registration was not predicated upon the fear that Naturally High might outperform the horses owned by the members of the Executive Committee. The record gives ample support to the finding of the district court that the Executive Committee sought to protect the industry and the general interest in the improvement of the quarter horse breed. Under *Silver* and *McQuade per se* treatment is inappropriate.

■ We think the denial of registration did not violate the rule of reason. Rule 92, in substance and application, is a legitimate tool in the effort to improve the breed. The district court found that Rule 92 is valid as a substantive dividing line between the quarter horse and other breeds. We accept this finding. Plaintiff argues that the discretion inherent in 92B and 92C, *e. g.,* determination whether the white is "excessive," was abused because no hearing was held. An examination of *Silver* provides the response to this contention.

*Silver* held that the stock exchange violated the rule of reason because the circumstances of the termination of direct wire connections were totally unjustifiable. There the temporary approval which the exchange had given to Silver's request was withdrawn without warning:

"By telephone calls, letters and a personal trip to New York, Silver sought an explanation from the Exchange of the reason for its decision, but was repeatedly told it was the policy of the Exchange not to disclose the reasons for such action."

373 U.S. at 344, 83 S.Ct. at 1250. *Silver* focuses upon the use of *ex parte* information and the absence of input by the applicant, as well as the failure to explain the decision reached. By contrast, the Association's information was derived primarily from the plaintiff. Before its final decision it requested additional photographs, and Hatley was alerted to the fact that "things weren't going too smooth" because of the white on the colt's upper legs. The "A" letter clearly stated that the reason for rejection was excessive white. Another factor distinguishes *Silver.* There the exchange provided for hearings to members for alleged rule violations, but Silver was a non-member. The Court noted that the extension of hearings to non-members would not burden the defendant. 373 U.S. at 363 n. 15, 83 S.Ct. 1246. Hatley was a member, and no provision for hearings existed at the time. Nor did Hatley ever request a formal hearing before the Executive Committee or any division of the AQHA. The following excerpt from *Silver* indicates the significance of this failure:

"Indeed, the aims of the statutory scheme of self-policing . . . are defeated when an exchange exercises its tremendous economic power without explaining its basis for acting, for the absence of an obligation to give *some form of notice* and, *if timely requested, a hearing* creates a great danger of perpetration of injury that will damage public confidence in the exchanges." *Id.* at 361, 83 S.Ct. at 1259 (emphasis added).

■ Finally, the district court specifically found that 92B and 92C were not applied in a discriminatory, arbitrary, or capricious

fashion. This finding buttresses our holding that there is no Section 1 violation.[7]

■■■ Section 2 is aimed at monopolies. *Standard Oil Co. v. United States,* 221 U.S. 1, 50–51, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Meaningful participation in this multimillion dollar industry is dependent upon AQHA membership and AQHA registration. No other quarter horse association of comparable stature exists.

But bigness is not necessarily badness. *United States v. Swift & Co.,* 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *cf. U. S. Steel Corp. v. Fortner Enterprises,* —— U.S. ——, —— n. 1, 97 S.Ct. 861, 51 L.Ed.2d 80 [1977]. The layman's monopoly is not necessarily an illegal monopoly under Section 2:

> "Anyone who owns and operates the single theatre in a town, or who acquires the exclusive right to exhibit a film, has a monopoly in the popular sense. But he usually does not violate § 2 of the Sherman Act unless he has acquired or maintained his strategic position, or sought to expand his monopoly, or expanded it by means of those restraints of trade which are cognizable under § 1."

*United States v. Griffith,* 334 U.S. 100, 106, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

When the nature of the industry requires some limitations upon entrance, Section 2 is not violated. *Cf. Deesen v. Professional Golfers, Ass'n, supra.* Even though a single organization exercises the dominant role in a market, its rules may be found to promote competition rather than hinder it. *Bridge Corp. of America v. American Contract Bridge League, Inc., supra; Deesen, supra.* The district court found that the Association's principals had no intent to use Rule 92 for anticompetitive purposes. It also found that the AQHA monopoly and rules did not inhibit but instead promoted competition. These findings withstand appellate attack. Rules 92B and 92C were not misused. In the absence of either anticompetitive purpose or effect, Hatley's Section 2 claim collapses.[8]

## TEXAS LAW DUE PROCESS

■ However, the district court did find grounds for injunctive relief in plaintiff's claim that defendants had violated Texas due process. The basis for the ruling was the failure to afford a hearing on the question of whether Naturally High had excessive white under Rules 92B and 92C. Federal review of quarter horse registration for state law violations is rare and curious,[9] but

---

**7.** An alternative ground requires dismissal of plaintiff's Section 1 claim. There is no conspiracy. Plaintiff's alleged conspirators were the AQHA, members of the Executive Committee and staff employee Jim Goodhue. There can be no conspiracy or agreement between a corporation and its officers and agents to violate the antitrust laws. *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). *Accord, Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389, 396 (5th Cir. 1976). *See also, Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 531 F.2d 910, 917 n. 8 (8th Cir. 1976); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 82 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Although certain individual defendants conducted their own breeding, racing and showing enterprises with the intent to profit, the finding that they "were at all pertinent times acting on behalf of the corporation and not as individuals" has ample support in the record. Thus we need not consider the possibility that a conspiracy can exist if the

officers have an independent stake in the illegal acts. *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391 (4th Cir. 1974).

**8.** Our holding that the AQHA has not violated the antitrust laws does not reflect upon the desirability of such hearings in antitrust cases. Defendants would find judicial review less perilous if they adopted a few procedural niceties. A hearing record simplifies the work of the judicial fact finder and lends credibility to defendants' protestations of fairness. The advantages far outweigh the minimal effort and expenditure involved in sending out a notice, assembling the parties and paying for a stenographer or tape recorder. *See* Comment, Trade Association Exclusionary Practices, *supra,* at 1508–10. In some cases other laws require that such hearings be conducted anyway. *See infra.*

**9.** *See Jackson v. American Yorkshire Club,* 340 F.Supp. 628 (N.D.Iowa 1971), a diversity action challenging the plaintiff's suspension and the refusal to register plaintiff's swine as pure bred Yorkshires.

nonetheless proper. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The district court ventured into the thorny and treacherous thicket of Texas law and emerged unscathed.

■ We resolve a threshold issue by holding that plaintiff had a justiciable right under Texas law. Denial of registration would have had grave economic consequences. If registered, Naturally High would be worth up to $100,000. As anything but a registered quarter horse, the colt would be worth less than $10,000. The difference is not insignificant. The diminution of value caused by defendants represents a destruction of property which an *Erie* -mindful[10] court cannot ignore. *Spann v. City of Dallas,* 111 Tex. 350, 235 S.W. 513 (1921).

Defendants argue that plaintiff had no right of registration because Naturally High has excessive white markings beyond the prescribed lines. The reasoning is attractive but circular. The procedure by which the defendants determined that Naturally High had excessive white is precisely what plaintiff attacks. Defendants would have us bootstrap the contested procedure into validity by use of the conclusion reached through the arguably invalid procedure. Unfortunately for defendants, the conclusion is fatally tainted by the means utilized to obtain it.

■ Moreover, Hatley's rights stem from his membership in the AQHA. Courts take cognizance of the right of a member to participate in the advantages incident to membership. *Jones v. Maples,* 184 S.W.2d 844, 848 (Tex.Civ.App.—Eastland 1944, writ ref'd). "Deprivation of pecuniary benefits resulting from contractual relations" raises a dispute to the level of justiciability. *Masonic Grand Chapter of Order of Eastern Star v. Sweatt,* 329 S.W.2d 334, 337 (Tex. Civ.App.—Ft. Worth 1959, writ ref'd, n. r.

e.). In *Eastern Star,* a fraternal benefit society was held to have illegally expelled plaintiff from membership. Plaintiff's right to sue emanated not from the mere deprivation of fellowship in the order, but from the fact that membership was a valuable commodity. Similarly, expulsion from union membership affects valuable rights which the courts protect. *Musicians Protective Ass'n, Local 466 v. Semon,* 254 S.W.2d 211 (Tex.Civ.App.—El Paso 1952, writ ref'd); *Cotton Jammers' & Longshoremen's Ass'n No. 2 v. Taylor,* 23 Tex.Civ. App. 367, 56 S.W. 553 (1900, no writ). Admittedly, the fabric of Texas law is not all of one piece in this area. The same court which decided *Eastern Star* later held that membership is a privilege, not a right, and that mandamus would not issue to halt an arbitrary refusal to accord membership. *Schooler v. Tarrant County Medical Society,* 457 S.W.2d 644 (Tex.Civ.App.—Ft. Worth 1970, no writ). However, in that case plaintiff's objective was to regain hospital staff privileges. The court observed that the denial of staff privileges was not caused by the medical society's denial of membership; therefore plaintiff had not shown a clear right to mandamus. *Id.* at 648. Concededly, the right to membership is not precisely congruent to the right to have a registration application fairly considered. One court has distinguished expulsion from the refusal to accept an application for membership renewal. *Guadalupe Valley Electric Cooperative v. South Texas Chamber of Commerce,* 374 S.W.2d 329, 333 (Tex.Civ. App.—San Antonio 1963, no writ). However, the court noted that the Chamber of Commerce by-laws specifically empowered its board of directors to reject applications for renewal. *Id.* Rules 92B and 92C are not so definite. On balance, the expulsion cases are apposite. The right *to* membership is meaningful only because there are rights *of* membership. Plaintiff has a cognizable claim under Texas law.

---

**10.** *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See also Harris v.* *Atchison, T. & S. F. Ry. Co.,* 538 F.2d 682, 690 (5th Cir. 1976).

Texas courts, in adjudicating claims such as Hatley's, require something akin to traditional due process on the part of voluntary associations. State action is inapplicable to the analysis. Normally, organizations are free to promulgate rules regarding eligibility for and admission to membership. These rules are enforced by the courts "unless they are against good morals or violate the laws of the state." *Cline v. Insurance Exchange of Houston,* 140 Tex. 175, 166 S.W.2d 677, 680 (1942). Texas courts preach and practice non-intervention so long as the governing bodies heed the bounds of reason, common sense and fairness, and do not violate public policy or the law. *Brotherhood of Railway Trainmen v. Price,* 108 S.W.2d 239, 241 (Tex.Civ.App.—Galveston 1937, writ dism'd); *accord, Hoey v. San Antonio Real Estate Board,* 297 S.W.2d 214, 217 (Tex.Civ.App.—San Antonio 1956, no writ). By analogy, the rules for registration, as a pecuniary right incident to membership, are similarly insulated from judicial review only insofar as they are reasonable in substance and administration.

The district court held that the exception to non-intervention was large enough for Naturally High to gallop through. Hatley's application presented a close case which required a hearing for the exercise of discretion by the Executive Committee. Notice and hearing have frequently been mandated in similar situations. An international union was blocked in its attempt to create a new local in the territory of an existing local until notice and hearing were afforded members of the old local. *Pait v. International Brotherhood of Boilermakers, etc.,* 322 S.W.2d 340 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.). The *Pait* court refused to invalidate the union constitution and instead supplied the provision of notice and hearing by implication, relying upon *United Brotherhood of Carpenters & Joiners v. Carpenters Local Union No. 14,* 178 S.W.2d 558 (Tex.Civ.App.—San Antonio 1944, writ ref'd, w. o. m.). In *Carpenters & Joiners,* the national union had issued an unmistakable warning that certain acts by the local union would result in its suspension. After the local defied the warning, it was suspended. The court held that the warning did not obviate the need for subsequent notice and hearing at which the errant local could present its case. *Id.* at 569–70. *Eastern Star, supra,* is yet another case invalidating expulsion in the absence of notice and hearing. In that case the member of the order was held to have properly refused to attend an immediate hearing, because the opportunity to make a defense necessarily included time to prepare an adequate defense. 329 S.W.2d at 337. *See also Musicians Protective Ass'n, supra; Cotton Jammers' & Longshoremen's Ass'n, supra.*

Conversely, occasional refusals to intervene in expulsion cases have been predicated upon the provision of an adequate hearing by the association. *Martinez v. Texas State Bd. of Medical Examiners,* 476 S.W.2d 400 (Tex.Civ.App.—San Antonio, writ ref'd, n. r. e.), *dismissed for want of a substantial federal question,* 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972); *Bullard v. Austin Real Estate Bd.,* 376 S.W.2d 870 (Tex.Civ.App.—Austin 1964, writ ref'd, n. r. e.); *Hoey v. San Antonio Real Estate Bd., supra.* Cases which have denied hearings in analogous situations can be distinguished. Either the court held that no property right was involved, *Dallas Athletic Club Protective Committee v. Dallas Athletic Club,* 407 S.W.2d 849, 851 (Tex.Civ.App.—Austin 1966, writ ref'd, n. r. e.), or observed that the hearing would be futile since the defendant association did not have final authority to make a decision. *Southern Methodist Univ. v. Smith,* 515 S.W.2d 63, 64 (Tex.Civ.App.—Dallas 1974, writ ref'd, n. r. e.) (NCAA eligibility); *Schooler v. Tarrant County Medical Society, supra.*

In this case Hatley, an AQHA member, requested that his colt be registered. Naturally High had white markings beyond the prescribed lines. It could not be registered under the objective standard established in Rule 92A, but 92B and 92C allow registra-

tion for horses with white beyond those lines, provided that the white is not excessive. This subjective determination requires the exercise of discretion. As noted earlier, this discretion had been exercised to register other horses, none of which had pedigree or conformation better than Naturally High. The Executive Committee decision to refuse registration without a hearing violated Texas due process.

Had Rule 92 specifically provided that registration under 92B or 92C was within the sole discretion of the Executive Committee without the requirement of a hearing, then conceivably defendants could have prevailed under a consent or waiver theory. *See Guadalupe Valley Elec. Cooperative v. South Texas Chamber of Commerce, supra.* Contra, *Eastern Star, supra,* at 337. But "[i]n the absence of any by-law, there could be no such assent." *Cotton Jammers' & Longshoremen's Ass'n, supra,* at 554.

Defendants claim that a hearing would have been afforded plaintiff had he requested it. In point of fact, the Executive Committee unilaterally foreclosed the possibility of registration under 92B or 92C, with or without a subsequent hearing, by sending the "A" letter to Hatley. In the words of the district court:

"The 'A' letter sent to Hatley on February 21, 1975 unequivocally and specifically informed plaintiff that he A.Q.H.A. would not register (the) colt under any of the provisions of Rule 92 or any subdivision or exception thereto. It did not give the plaintiff any right of appeal to any other body or committee of A.Q.H.A. and the receipt of such a letter constitutes a final determination of A.Q.H.A. that the colt would not be registered."

Memorandum opinion at 5. This passage disposes of that argument.

 Admittedly, Hatley eventually applied for hardship registration under 92C

six months after the filing of this suit; he later withdrew the application. However, the district court found, and we agree, that:

"Any hearing tendered by the Committee after the institution of legal proceedings is not construed by the court to be an offer of an impartial hearing which would satisfy due process requirements."

Memorandum opinion at 14. The record indicates the depth of feeling which this case has engendered. The adamantine position of the litigants makes it unlikely that a hearing could be conducted in a neutral and detached fashion. Nor does Hatley's failure to request a hardship hearing before he instituted this lawsuit vitiate his claim. The "A" letter was the final word and indicated that a hearing of any sort would be meaningless.

## APPROPRIATE RELIEF

 The district court had to fashion a remedy in a situation where the actions of the Executive Committee made a procedurally fair determination impossible. The court ordered that the colt be registered without being gelded. Defendants complain that Naturally High, in addition to staining the quarter horse registry, will sire up to fifteen hundred foals which will carry the recessive paint horse gene.

We note that the district court did not explicitly find that Naturally High is a quarter horse. It held only that the Association had forfeited the right to make that determination. However, the district court is well equipped to do so. We therefore remand the case for a hearing to determine whether or not Naturally High is a quarter horse under Rule 92.[11]

If Naturally High is registered upon the conclusion of the hearing, there is no reason why the Association cannot consider each of the foals when applications for registration

---

11. The district court may, in its discretion, appoint a master under F.R.Civ.P. 53.

**658**

are submitted. Should any descendents of Naturally High have excessive white, as determined consistent with Texas law, the AQHA may refuse to register them.

Neither the opinion of the district court nor our partial affirmance affects the substantive validity of the "white rule." Excepting only the omission of notice and hearing, Rule 92 received the imprimatur of the district court. A procedural lapse, not a substantive defect, is condemned in this case. Our opinion should not be construed as establishing lines of demarcation between types of horses.

We note that the AQHA affixed certain editorial comments to the registration certificate issued to Mr. Hatley. See Figure 2. It is unclear whether the district court intended the registration certificate to inform potential buyers and breeders that registration was irregular. In any event, a portion of these comments may be inaccurate in the event the horse is registered. The district court may order appropriate compliance.[12]

■ Finally, plaintiff's claim for attorney's fees under Article 2226, Vernon's Ann.Civ.St.[13] is without merit. The statute contemplates a claimed amount. *See Gateley v. Humphrey,* 151 Tex. 588, 254 S.W.2d 98 (1952). And we do not believe that Naturally High can be considered as "stock killed or injured" within the meaning of the statute.

### AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

12. We intimate no view of the proper disposition of this matter by the district court.

13. Article 2226 provides:
"Any person having a valid claim against a person or corporation for personal services rendered, labor done, material furnished, overcharges on freight or express, lost or damaged freight or express, or stock killed or injured, or suits founded upon a sworn account or accounts, may present the same

APPENDIX

Figure 1

The shaded areas depict the places where a horse may have white markings and remain eligible for registration under Rule 92A.

to such person or corporation or to any duly authorized agent thereof; and if, at the expiration of thirty (30) days thereafter, the claim has not been paid or satisfied, and he should finally obtain judgment for any amount thereof as presented for payment to such person or corporation, he may also recover, in addition to his claim and costs, a reasonable amount as attorney's fees, if represented by an attorney."

Figure 2

Certificate of Registration

## THE AMERICAN QUARTER HORSE ASSOCIATION

NAME NATURALLY HIGH NUMBER 1160915 STATE FOALED OKLAHOMA

COLOR SORREL SEX STALLION FOALED MARCH 15, 1974

BREEDER HATLEY MELVIN CITY OKLAHOMA CITY STATE OKLAHOMA

OWNER HATLEY MELVIN CITY OKLAHOMA CITY STATE OKLAHOMA

SIRE MR JET MOORE 606940 SIRES SIRE JET DECK 167014

DAM CHICKAMONA 352222 DAM'S SIRE TRIPLE CHICK 72953

MARKINGS BLAZE ENDING IN FLESH COLORED SNIP. LOWER LIP FLESH COLORED BEING NARROW LEFT SIDE. LEFT FORE LEG: STOCKING A LITTLE OVER 8" ABOVE MIDDLE OF KNEE. WHITE PIGMENT UNDER WHITE HAIR. RIGHT FORE LEG: STOCKING TO JUST ABOVE KNEE. WHITE PIGMENT UNDER WHITE HAIR. LEFT HIND LEG: FULL STOCKING BEING HIGHER IN FRONT. FEW WHITE HAIRS IN BODY; CONCENTRATED ROAN HAIRS BEHIND RIGHT FLANK. NO OTHER MARKINGS.

This is to certify that the above named and described horse has been registered in the Stud Book of The American Quarter Horse Association Such acceptance being based upon an application, submitted by and attested to, by the owner at the time of registration This certificate is issued with the right to correct and/or cancel

*Don Jones*
SECRETARY

DATE ISSUED APRIL 9, 1976 1307.

### TRANSFER RECORD

The last name entered hereunder is the present owner of this horse as shown on the records of The American Quarter Horse Association. To transfer the within described horse, make transfer on a separate transfer form or bill of sale which will be furnished free by the ASSOCIATION Send it to the office of the American Quarter Horse Association------along with the registration certificate and the transfer fee The transfer of ownership will then be made on this certificate and mailed as instructed

| Date of Purchase | Name and Address of Owner as Shown by Transfer Record | Attest of Record by Secretary |
|---|---|---|
| | REGISTERED PURSUANT TO ORDER OF THE HONORABLE FEDERAL DISTRICT COURT, IN HATLEY AGAINST AMERICAN QUARTER HORSE ASSOCIATION, ET. AL., NO. CA-2-75-144, IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, AMARILLO DIVISION, PENDING APPEAL TO THE UNITED | |

Copyright 1974, AMERICAN QUARTER HORSE ASSOCIATION