**BRIDGE CORPORATION OF AMERICA,**
Appellant,

v.

**The AMERICAN CONTRACT BRIDGE LEAGUE, INC., et al., Appellees.**

No. 23292.

United States Court of Appeals, Ninth Circuit.

June 25, 1970.

Rehearing Denied Aug. 18, 1970.

Fred Flam (argued), Wm. G. Tucker, Richard T. Drukker, of Flam & Flam, Chase, Rotchford, Drukker & Bogust, Los Angeles, Cal., for appellant.

Julian von Kalinowski (argued), Irwin F. Woodland, Kenneth M. Poovey, Kenneth W. Anderson, of Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellees.

Before HAMLEY and KILKENNY, Circuit Judges, and POWELL, District Judge.*

POWELL, District Judge.

In 1964 Bridge Corporation of America (BCA) instituted this action against American Contract Bridge League, Inc. (ACBL) and several of its agents for relief for claimed violations of the Sherman Act, 15 U.S.C. §§ 1, 2, violations of the Cartwright Act, Cal. Bus. & Prof.Code §§ 16720, 16726 and 16758, and for unlawful interference with prospective business advantage. The court below dismissed the three causes of action and this court reversed and remanded for further proceedings. 366 F.2d 779 (9th Cir. 1966).

---

* The Honorable Charles L. Powell, United States District Judge for the Eastern District of Washington, sitting by designation.

Upon remand the case was tried first on the issue of liability. The district court concluded at the close of that trial that the plaintiff had failed to meet its burden of proof and entered judgment for the defendants. The plaintiff has again appealed.

Appellee, ACBL, was organized in 1937 as a non-profit corporation for the purpose of conducting and sanctioning bridge tournaments and determining the rank of bridge players by the issuance of ratings and master points. At the time this suit was commenced ACBL had approximately 185,000 members who were organized into geographical units. The units participate in over 500 sectional and regional tournaments. At these tournaments bridge players win master points for national ranking. Since bridge players compete to win master points and since ACBL is the only organization which awards master points it is without competition in the field of organized bridge tournaments. Although individual units are in many respects autonomous they are never free from the overall supervision of ACBL since it must approve unit bylaws and conditions of play before it will sanction a tournament.

By demanding uniformity in the handling of bridge competitions the ACBL has maintained the integrity of the master point system and thus has insured continued player interest in organized bridge league tournaments.

This suit grew out of a dispute concerning the use of a specialized portable digital computer system for scoring duplicate bridge tournaments.

In 1961 a representative from the technical staff of the ACBL, Col. Baldwin, wrote to the now president of BCA, Mr. Flam, about an article appearing in the New York Times on a patent application by Mr. Flam for a computerized tournament bridge scoring system. Mr. Flam testified that he recognized that in order to promote his business he would have to work through League components (units), if not the national headquarters.

In subsequent correspondence Mr. Flam said he expected to have a completed pilot model in April 1962. Col. Baldwin wrote back stating that the League would welcome a computerized scoring method at a cost comparable to the existing manual method. Following a meeting between Col. Baldwin and Mr. Flam in Houston and another in Los Angeles Mr. Flam agreed to modify his computer to the League's system approach.

In May of 1963 the modified computer was ready for initial testing and was demonstrated in small tournaments at Redlands and Riverside. Based on the success of those demonstrations Mr. Flam reached an agreement with the director of the upcoming Riverside-Redlands tournament to score their sectional. After that agreement was reached, but before the tournament was conducted, Mr. Flam wrote to Col. Baldwin suggesting a personal demonstration in Los Angeles when Col. Baldwin would be there for the summer nationals. At that time the board of directors of ACBL would be conducting their meeting in Los Angeles.

The demonstration was given and the board members were invited to attend when their meeting adjourned. The managing officer of ACBL, Mr. Landy, visited the demonstration but was only able to stay for 10 or 15 minutes. While there he learned of the contract with BCA for the upcoming Riverside-Redlands tournament. Shortly thereafter Mr. Landy called Mr. Flam and told him that the League would not sanction the Riverside-Redlands tournament if the computer was used to score. It was suggested that Mr. Flam demonstrate the computer to the technical staff and board of directors of ACBL at the fall national tournament in Florida. Mr. Flam wrote back stating that due to the expense of coming to Florida and the time it would take from his other work

he could not attend.[1] Mr. Flam then requested a member of the board of directors of ACBL, Mr. Andersen, to present a resolution providing for the use of his computer at sanctioned tournaments. Mr. Andersen discussed the resolution with Mr. Landy in advance of the board meeting. It was agreed between them that it would not be presented for the board's consideration.

Mr. Landy then wrote to Mr. Flam in reference to Mr. Flam's letter to Mr. Andersen and also concerning the League's position on the use of his computer. The letter was as follows:

"Judging by your letter of August 29th to Eilif Andersen, we wasted a lot of time and you wasted a lot of money when we spoke on the phone a few weeks ago.

I was particularly impressed by the sentence 'The only reason stated to me in a long-distance telephone conversation was that in the opinion of the Executive Secretary, use of the table equipment would be an inconvenience to the players.' Actually, I must have spent at least five minutes trying to explain to you that the use of your portable digital computer would cause so many changes in our present procedures in conducting tournaments that the necessary difference would have to be first cleared by the National Board of Directors. I am referring, of course, to the types of supplies, the type of boards, tournament direction, the special form to be used by the players in marking the scores and the necessity for checking them before the results could be posted, the final recap sheets, etc., etc. I mentioned the fact that you are including the cost of the supplies in your price, whereas, we are now furnishing free expendable supplies to most of the tournaments in the West and almost all of them in the East; the question of how many tournament directors will be needed in addition to the computer for what number of tables, and many other problems which would have to be decided.

You again claim that the BCA system complies in every respect with part VIII of the Laws of Duplicate Bridge and with every known regulation of the American Contract Bridge League. Even if the BCA system does comply with part VIII, which it doesn't since the computer cannot be considered the director or scoring assistant as contemplated in the Laws, again I want to point out that you are referring to the International Laws of Duplicate Bridge which are intended to apply generally around the world, but they do not and cannot deprive various sponsoring organizations or national leagues of their right to adopt their own procedures for holding tournaments. The 'Laws of Duplicate Bridge' 'are designed to define correct procedure and to provide an adequate remedy whenever a player accidentally, carelessly or inadvertently disturbs the proper course of the game, etc.' and have nothing to do with score slips, recap sheets, pencils, duplicate boards, etc.

Inasmuch as it's your equipment and your proposal, the way the proposal is presented to the Board is up to you. If you think it would be too expensive

---

1. The letter is in pertinent part as follows:
   "We have given some thought to your suggestion that we take this matter up with the Board of Directors. Since talking with you, we realize that transporting the equipment all the way to Florida will be a substantial expense, especially considering the time that I will have to steal from my law practice. Perhaps there is some other way in which the matter can be presented. For example, Colonel Baldwin has the experience and training that might justify his appointment as a special committee of one to report to the Board of Directors based upon his personal observation of our operations. After all, the League did spend many thousands of dollars on a *survey* to see if a computer system *could* be used for scoring functions. We already *have* a computer system that should warrant some investigation."

and time-consuming to arrange for a trial run in one of the side sections in Miami Beach for the benefit of the Board members, we cannot and would not attempt to force you to do so. If you want to send an explanatory letter with copies of the forms and supplies proposed to be used and ask Colonel Baldwin to provide additional explanation when requested and you think he is capable of doing so to your satisfaction, that is also up to you.

I should point out that many others have been working on computer scoring and a man in New York has worked out a method which has proven very successful during several trial runs which provided unofficial scores as was done by Honeywell in Los Angeles last month. In his method, it is not necessary to transport any portable equipment, which is an advantage, of course. So, you do have competition and you might want to consider that fact when you finally decide whether or not to come to Miami Beach in November.

I still don't understand why you arranged a special showing of your equipment for the Bridge Teachers Association and invited our Board to come in as an afterthought, inasmuch as, you were planning to arrange contracts with our Units in the West to score their tournaments. I suppose it's because you fail to realize that tournament procedures must be uniform and the rules are laid down by the National Board of Directors."

After additional correspondence Mr. Landy and Mr. Flam agreed to meet in Los Angeles. The meeting was held and Mr. Landy made suggestions to Mr. Flam for additional modification to BCA's system. Mr. Flam responded by letter stating that he could not afford to make additional modifications to the equipment on his own. He requested financing from the League or approval of his computer for sanctioned meets in order to raise the needed capital. ACBL would not agree to finance the modification nor would they permit its use for official scoring without demonstrating its use to ACBL's technical staff and board of directors. This suit was then brought.

At the close of the trial the court made the following comments:

"THE COURT: It resolves itself down to this: I don't think the defendant has ever been given a fair opportunity to deal. Now you have presented it with a revolutionary device which requires a considerable amount of revision on the part of the defendant's procedures in order to make use of this device. It has to do with the calculation or the determination of these honor awards which are the essence of the defendant's system. In order to maintain the integrity of that system it is only right and proper— and they certainly have the duty—to see that any scoring device is carefully analyzed and carefully studied and that no system be adopted until it has been proven to somebody's satisfaction, to their satisfaction, reasonable satisfaction, I might say, that it can operate in a fair and just fashion.

I am not sure the evidence even establishes that the device can do the work as completely as you seem to think it can. But assuming it does do this calculation fast, in a beneficial way and with an accurate result nevertheless the defendant's agents have to be given an opportunity to test it out and they have to be convinced that it can be used properly to produce a proper result.

I don't think you have given them an opportunity to make that full and complete test or to satisfy themselves.

You never quite got together. I don't remember that they have ever actually refused to give you an opportunity to demonstrate it. You just could never get together at a convenient time.

You have taken that refusal to review a demonstration at a time not convenient to them as a complete and unconditional refusal to do business with

you. I don't interpret the evidence that way at all." (Tr. 834–835).

■ Appellant argues that the action of the League in refusing to sanction the Riverside-Redlands tournament if the computer was used constituted a group boycott and was therefore a *per se* violation of the Sherman Act.[2]

For many years the Sherman Act was construed by the courts as prohibiting "only those contracts or combinations which 'unreasonably' restrain competition. Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

From this standard evolved a rule of *per se* unreasonableness in certain situations.

"[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210, 60 S.Ct. 811, 84 L.Ed. 1129, division of markets, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; group boycotts, Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 and tying arrangements, International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20." Northern Pacific Railway Co. v. United States, 356 U.S. at p. 5, 78 S.Ct. at p. 518.

We do not find that the underlying considerations of the *per se* unreasonableness rule are present in this case and therefore look to the reasonableness of ACBL's action with regard to BCA. In reaching this conclusion we refer to Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969) cert. den., 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) where the court in refusing to apply the group boycott *per se* rule made these observations: "We find that in all of plaintiff's cases [same cases that BCA cites here] there was a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." 416 F.2d at p. 76.

The court went on to distinguish those cases and concluded that the proper approach to take was that suggested by Barber in "Refusals to Deal Under the Federal Antitrust Laws," 103 U. of Pa. L.Rev. 847 (1955). We quote from the applicable portions of that article.

---

2. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 15 U.S. C. § 1.

"Every person who shall monopolize, or attempt to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C. § 2.

"Because all of these situations involve an agreement between two or more persons under which one or more of them agree not to deal with third persons and for that reason foreclose a part of the market to such third persons, they are all subject to scrutiny under the antitrust laws. But in the ordinary case these do not involve combining for the primary purpose of coercing or excluding; rather they involve combinations of two or more persons to further directly the business of the parties to the agreement, and the effect on third parties and on competition is indirect. The issue in these cases is not the existence or non-existence of concerted refusal to deal, but rather whether the purpose and effect of the operation of the contract, association, exchange or joint sales agency was such as unreasonably to exclude outsiders from participation in the trade in question. The principle of the group boycott cases—that it is prima facie unreasonable for a dominant group to combine to coerce— is not here applicable." At pages 876–877.

In our case BCA does not argue that the units of ACBL have combined with the headquarters of ACBL for the primary purpose of coercing or excluding. On the contrary, the facts show simply that the entire League operation is structured in such a manner as to promote bridge competition on a national scale. See e. g., Deesen v. Professional Golfers' Association of America, 358 F.2d 165, 170 (9th Cir.) cert. den., 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966). The effect the League might have on third parties and on competition is at best indirect.

What we can glean from the record is that the ACBL in dealing with the BCA was motivated not by any anti-competitive motive or purpose to eliminate or damage BCA, but to insure that the manner in which league bridge competition was scored would not create a situation where the integrity of the master point system, the inspiration of league tournament play, would be questioned.

Premising our decision on these facts we would be creating a harsh precedent if we automatically applied the group boycott *per se* rule. As was said in Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 579, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925) and quoted in Joseph E. Seagram & Sons, Inc., supra:

"[I]t should be remembered that this court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied."

▪ The evidence before the District Court clearly supports its judgment that the restraint imposed by ACBL on BCA was a reasonable one. The ACBL did not refuse to sanction any tournament scored by a computer but set forth reasonable conditions, based on a legitimate interest, in order to determine if BCA's computer could do the job accurately, cheaper, faster and without significantly disrupting the manner or conditions of play. BCA in dealing with ACBL did not maintain that those conditions were basically unreasonable, although they now seem to question them. BCA told ACBL that it was not financially able to meet the conditions.

The judgment of dismissal is supported by the findings of fact. An examination of the record has led us to conclude that the findings are sustained and are not clearly erroneous. Rule 52(a) Fed. R.Civ.P.

Since we find the actions of ACBL reasonable and not violative of Secs. 1 and 2 of the Sherman Act, it is unnecessary to discuss BCA's additional grounds

for claimed liability. The finding of reasonableness precludes recovery under the Cartwright Act or for claimed unlawful interferences with prospective business advantage.

Affirmed.