LAS VEGAS SUN, INC., a Nevada Corporation, Plaintiff-Appellant.

v.

SUMMA CORPORATION, dba Castaways Casino, Frontier Hotel, and Desert Inn Hotel, Hotel Properties, Inc., dba Landmark Hotel, Hughes Television Network, Inc., dba Sands Hotel, First National Bank of Nevada, dba Silver Slipper, Frank W. Gay, and Chester Davis, Defendants-Appellees.

No. 77–2292.

United States Court of Appeals,
Ninth Circuit.

Nov. 15, 1979.

Rehearing Denied Jan. 17, 1980.

Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., for plaintiff-appellant.

Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., argued for defendants-appellees; Walter H. Beebe, Maxwell E. Cox, Harriet S. Stein, New York City, Morse, Foley & Wadsworth, Las Vegas, Nev., on brief.

Davis & Cox, Los Angeles, Cal., for defendants-appellees, Frank Gay and Chester Davis.

Before DUNIWAY and WALLACE, Circuit Judges, and BLUMENFELD,* District Judge.

WALLACE, Circuit Judge:

The Las Vegas Sun, Inc. (the Sun) appeals the district court's refusal to grant money damages and injunctive relief for alleged violations of section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, section 8 of the Clayton Anti-Trust Act, 15 U.S.C. § 19, and the common law of Nevada. The basis of the Sun's complaint is that various corporations and individuals combined and conspired to ruin the Sun's business by withdrawing their commercial advertising from its newspaper.

The district court held that neither the Sherman Act, the Clayton Act, nor the Nevada common law had been violated by any of the charged activities. The district court also denied the Sun's motion, pursuant to Rules 38(b)[1] and 39(b), Federal Rules of Civil Procedure, to grant a jury trial on issues raised in the amended complaint and to set aside the Sun's prior waiver of a jury trial. We hold that the district judge ruled

---

* Honorable M. Joseph Blumenfeld, United States District Judge, District of Connecticut, sitting by designation.

1. The Sun cited only Rule 39(b), yet its motion for jury trial as of right is properly made pursuant to Rule 38(b). We consider the Sun's contentions under each Rule.

correctly on both issues, and therefore affirm.

## I

The Sun owns and publishes the *Las Vegas Sun*, one of two major daily newspapers in Las Vegas, Nevada. Its average daily circulation is 38,447; the circulation of its evening competitor, the *Las Vegas Review-Journal*, is 67,921.

The corporations sued, Summa Corporation (Summa), Hughes Television Network, Inc. (HTV), and Hotel Properties, Inc. (HPI), were all owned or controlled by the late Howard R. Hughes, Jr.[2] Through Summa, HTV, HPI, and a sole proprietorship in the Silver Slipper Casino, Hughes controlled six hotel-casino resorts in Las Vegas, Nevada. None of these resorts was separately incorporated, and Hughes personally held, in conjunction with various officers and directors of his companies, each casino's gambling license. The district court found that Summa operated all of the Hughes Resorts as divisions, regardless of which of Hughes' corporate entities actually held record title to the respective property. Further, the Hughes Resorts held themselves out to the public as a single business known as "Hughes Resort Hotels" and "Hughes Hotels and Casinos." There was testimony by Frank Gay, the chief executive officer of Summa, that the various hotel-casinos did compete with each other and that Summa encouraged this competition. The district court concluded, however, that the various hotel-casinos were run by Howard Hughes as a single economic unit and did not in fact compete.

The relationship between Summa and the Sun began in May 1967, when Hughes Tool Company (Hughes Tool), Summa's predecessor, and the Sun agreed that Hughes Tool would advance $500,000 to the Sun for prepaid advertising. Hughes Tool was entitled, pursuant to this agreement, to designate any of the Hughes Resorts or other Hughes businesses to draw on this credit for their advertising in the *Las Vegas Sun.*

The district court found that the Sun obtained the $500,000 advance through its close relationship with Robert Maheu, then head of Hughes' Nevada operations. Shortly after the Sun received the advance, Hank Greenspun, the owner of the Sun, who had previously opposed issuance of multiple gambling licenses, testified before the Nevada Gaming Commission in favor of issuing multiple licenses to Hughes. During 1967 through 1969, Maheu arranged for payments and loans on extremely favorable terms from Summa to the Sun and Greenspun, totaling $11,373,064.45. The day after the largest single payment of these transactions was received, Greenspun "loaned" Maheu $150,000. Maheu has never paid any principal or interest on this "loan."

Hughes fired Maheu in December 1970. Immediately thereafter, the Sun reversed its pro-Hughes editorial policy and began to attack Hughes and his businesses. The Sun's hostile editorial stance, in addition to the approaching exhaustion of the prepaid advertising credit, led Summa's Public Relations Department to review the "cost-effectiveness" of its advertising in both the *Las Vegas Sun* and the *Review-Journal.* This study concluded that the Hughes Resorts' advertising cost $15.83 per thousand paid subscribers if purchased from the *Review-Journal,* and, after eliminating duplication between the two newspapers, cost $47.42 per thousand in the *Las Vegas Sun.* In addition, the head of Summa's Public Relations Department, Robert Bennett, determined that the quality of printing and photographic reproduction was superior in the *Review-Journal.* Nonetheless, Bennett decided to continue advertising in the *Las Vegas Sun* until the prepaid account was exhausted.

On April 12, 1976, the *Las Vegas Sun* carried a front-page article which implied that certain Summa officers, including Frank Gay, had been guilty of forgery and

---

**2.** First National Bank is sued in its capacity as the Special Administrator of the Hughes estate, whereby it does business as the Silver Slipper Casino, which Hughes held as sole proprietor before his death.

other criminal conduct. By that date the prepaid advertising account had been reduced to a trivial amount. After consultation with Gay, Bennett decided to cancel all Hughes Resorts advertising in the *Las Vegas Sun* and directed each of the six hotel-casinos controlled by Hughes to cancel any advertising which could be cancelled and to purchase no new advertising space in the *Las Vegas Sun*. The managers of the six hotel-casinos followed Bennett's direction.

The district court found that although Bennett anticipated that his decision to withdraw Hughes Resorts' advertising might injure the Sun, Bennett did not act with this effect as his purpose. The court specifically found that Bennett's decision was prompted by legitimate business considerations.

The Sun's business was not ruined by Summa's termination of advertising in the *Las Vegas Sun*. In fact the district court found that the Sun's revenue and total inches of display advertising increased in each month after April 1976.

## II

The Sun's Sherman Act § 1, 15 U.S.C. § 1, and Clayton Act § 8, 15 U.S.C. § 19, claims are each premised on the ground that the six hotel-casinos were separate, competing, business entities. To prove a Sherman Act § 1 violation, the Sun must show that those charged "conspired" to restrain trade. To prove a violation of section 8 of the Clayton Act, the Sun must demonstrate that the two individual defendants, Gay and Chester Davis, Summa's chief counsel, were simultaneously acting as directors of corporations which, "by virtue of their business and location of operation," are "competitors." 15 U.S.C. § 19. Because the district court's findings that the corporations involved neither competed among themselves, nor were separate entities capable of "conspiring" are not clearly erroneous, we hold that both the Sherman Act and the Clayton Act claims must fail.

## A.

We have stated:

The Supreme Court repeatedly has held that "common ownership and control does not liberate [two separately incorporated subsidiaries within the same corporate family] from the impact of the antitrust laws . . . especially . . . where [they] hold themselves out as competitors." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). *Accord, Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

*Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 625 (9th Cir. 1977). Nevertheless, "the mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy." *Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 456 (9th Cir. 1979). *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 801–02 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). To "conspire" within the meaning of the Sherman Act, corporate entities within a single organization must be sufficiently independent of each other for their concerted action to raise antitrust concerns. *See id.; Harvey v. Fearless Farris Wholesale, Inc., supra*, 589 F.2d at 455–58. To determine whether corporate entities are separate enough to be capable of conspiracy, a court must examine the particular facts of the case before it. *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d at 625–26; *Knutson v. Daily Review, Inc.*, 548 F.2d at 802. If the intra-enterprise entities "hold themselves out as competitors," the rule that they cannot avoid Sherman Act liability by hiding behind their common ownership and control is "especially applicable." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951).[3]

---

**3.** Commentators, speculating that justifiable reliance may be the theoretical underpinning for the "holding out" theory announced in *Kiefer-Stewart*, have wondered at the absence of a

■ We have considered the problem of intra-enterprise conspiracy under the antitrust laws on two recent occasions. In *Knutson v. Daily Review, Inc., supra,* a parent corporation and its wholly-owned subsidiary published several newspapers. A single individual controlled the parent, headed each of its subsidiary corporations, and served as publisher of all the newspapers. In dicta, we held that the lack of intra-enterprise competition between the defendant corporations, coupled with their common ownership and direction by a single individual, "[a]rguably," 548 F.2d at 803, made the corporations legally incapable of conspiracy under the Sherman Act. In *Harvey v. Fearless Farris Wholesale, Inc., supra,* 589 F.2d 451, we held that no Sherman Act § 1 violation occurred when an individual who wholly owned and controlled a gasoline wholesaling company and five retail gasoline outlets refused to sell gasoline to seven unaffiliated retail customers. We first pointed out that a common director or officer cannot "with antitrust impunity make decisions on behalf of two or more corporations, where those corporations have antitrust significance as separate economic units." *Id.* at 458. Yet because the controlling individual was solely responsible for the decision to cut off sales to the unaffiliated gasoline retailers, and his corporations did not compete, we found that the corporate entities were not economic units capable of conspiracy under Section 1. That termination of gasoline deliveries to the unaffiliated retailers was actually implemented by an agent of the controlling individual was deemed irrelevant; it being "fundamental that an agent cannot conspire with his principal." *Id.* at 457.

It is undisputed in the instant case that Bennett made a unilateral decision on Summa's behalf to terminate all advertising in the *Las Vegas Sun,* which decision was forthwith implemented by personnel at each of the six hotel-casinos. The district court found that the Hughes Resorts hotel-casinos neither competed with each other nor represented themselves as competitors. These findings are not clearly erroneous. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 89 (1948). The hotel-casinos represented themselves to the public as a single business entity, Hughes Resorts. Each of the six hotel-casinos paid for its advertising out of the common Summa prepaid advertising account. Thus, the Sun essentially dealt with a single economic entity. Bennett's decision, as Summa's Public Relations Director, to exhaust and not replenish the prepaid account, was a unilateral and thus not concerted refusal to deal with the Sun. As in *Harvey,* we deem it irrelevant that Summa's agents, the managers of the six casinos, actually implemented the decision. We agree with the district court that there was no Sherman Act violation.

### B.

Because the Hughes Resorts operated as a single economic entity and not as competitors, the presence of common directors on the boards of the three controlling corporations (Summa, HTV, and HPI) does not violate section 8 of the Clayton Act. Corporations are "competitors" for purposes of section 8 only if "elimination of competition by agreement between them," 15 U.S.C. § 19, would constitute an antitrust violation. *In re Penn Cent. Sec. Litigation,* 367 F.Supp. 1158, 1168 (E.D.Pa.1973); *United States v. Sears, Roebuck & Co.,* 111 F.Supp. 614, 615, 620 (S.D.N.Y.1953). The language of section 8 presumes that the allegedly interlocking corporations are competitors, *i. e.,* presently competing. The evil sought to be avoided is the lessening of that competi-

showing of reliance in that case. *See* Willis & Pitofsky, *Antitrust Consequences of Using Corporate Subsidiaries,* 43 N.Y.U.L.Rev. 20, 37 (1968); Note: *Intra-Enterprise Conspiracy Under Section I of the Sherman Act: A Suggested Standard,* 75 Mich.L.Rev. 717, 735 (1977). Even if such reliance is the basis of the "holding out" theory, however, the Sun clearly did

not rely on the hotel-casino's competitiveness to generate advertising in its paper; the prepaid, common account instituted by Maheu for all the Hughes-controlled businesses indicates quite the opposite: that the Sun's business with the Hughes Resorts derived from Maheu's common control.

tion. Clearly, where competition does not exist, the statute cannot apply.

## III

■■■ Even assuming that defendants were capable of conspiring, there still could be no Sherman Act violation based on the facts of this case. Not all agreements between competitors to cease dealing with a third party are *per se* "in restraint of trade" within the meaning of section 1 of the Sherman Act. *Neeld v. National Hockey League*, 594 F.2d 1297, 1299–1300 (9th Cir. 1979); *Ackerman-Chillingworth v. Pacific Elec. Contractors Ass'n*, 579 F.2d 484, 490 n.7 (9th Cir. 1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *Bridge Corp. of America v. American Contract Bridge League, Inc.*, 428 F.2d 1365, 1369–70 (9th Cir. 1970), *cert. denied*, 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 76 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Where an agreement between competitors "having a primary purpose and direct effect of accomplishing a legitimate business objective is also alleged to have had an incidental and indirect adverse effect upon the business of some competitors," *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1003 (9th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973), the agreement is tested under the "rule of reason." *Id.* at 1003 n.2. *See Neeld v. National Hockey League, supra*, 594 F.2d at 1299–1300; *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra*, 416 F.2d at 76–80. *See also Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 (1977) ("*Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anti-competitive."). The district court found that Summa's action by Bennett to terminate its advertising account with the *Las Vegas Sun* was motivated by legitimate business considerations and had an insignificant effect on the Sun's business. Summa had apparently decided that it could advertise more cheaply and

effectively in the Sun's competitor, the *Review-Journal*. We see no reason to disturb the district court's finding. Thus, the alleged agreement among the six hotel-casinos controlled by Summa to cease dealing with the Sun must be tested under the "rule of reason."

The case before us is not unlike several recent cases in which we have applied the rule of reason and found no Sherman Act § 1 violation. In *Cartrade, Inc. v. Ford Dealers Advertising Ass'n*, 446 F.2d 289 (9th Cir. 1971), *cert. denied*, 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972), we found that the Ford Motor Company and Ford Dealers Advertising Association could in good faith believe that reducing the number of "cartraders" used by the dealers from two to one would reduce expense and wasted dealer time and thus increase profits. Because we could think of "inumerable reasons" why the various dealers might have become dissatisfied with the terminated car trading company, and because we found no anticompetitive effect other than the terminated company's own loss of business, we found no antitrust violation. We stated: "To find liability here would be to saddle the dealers with Cartrade's services forever." *Id.* at 294.

In *Neeld v. National Hockey League, supra*, 594 F.2d at 1300, and *Bridge Corp. of America v. American Contract Bridge League, Inc., supra*, 428 F.2d at 1370, we upheld hockey and bridge league regulations designed to facilitate play in the respective activities. In each case we found a legitimate justification for the regulations, and only an incidental effect on business competition. In *Neeld* we pointed out that any anticompetitive effect of the regulation prohibiting one-eyed players from competing in the National Hockey League was at most *de minimis*, and incidental to the primary safety purpose of the regulation. *Neeld v. National Hockey League, supra*, 594 F.2d at 1300.

As indicated above, we accept the district court's findings that Bennett's termination of the Sun advertising account had neither an anticompetitive purpose nor a significant anticompetitive effect. Bennett's decision was supported by a legitimate business jus-

tification: economizing on advertising in the Las Vegas area. The district court specifically rejected the Sun's allegation that Summa sought to change the Sun's editorial policy. Because there was neither an anticompetitive purpose nor any significant anticompetitive effect, Summa's action did not violate the "rule of reason." Hence, even assuming that the various Hughes Resorts were capable of intra-enterprise conspiracy, no Sherman Act § 1 violation occurred.

### IV

■ Our conclusion that the district court's finding that Bennett's decision to terminate the Hughes Resorts' advertising in the *Las Vegas Sun* was supported by legitimate business motives was not clearly erroneous also disposes of the Sun's claim under Nevada common law. The leading case relied upon by the Sun, *Short v. Hotel Riviera, Inc.*, 79 Nev. 94, 378 P.2d 979, 982 (1963), illustrates that a malicious concerted refusal to deal is actionable. But where, as here, the refusal to deal is motivated by a legitimate business justification, it is privileged. *Cf. Lewin v. St. Joseph Hosp. of Orange*, 82 Cal.App.3d 368, 394, 146 Cal. Rptr. 892, 908 (1978); *Widdows v. Koch*, 263 Cal.App.2d 228, 236, 69 Cal.Rptr. 464, 469 (1968).

### V

■ We now turn to the Sun's last contentions: (1) that it was entitled as of right to a jury trial on new issues raised in its amended complaint, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure; and (2) that the district court denial of its motion for a jury trial pursuant to Rule 39(b) was an abuse of discretion.

The additional claims alleged in the amended complaint were the Clayton Act § 8 and the Nevada state common law claims. The gist of the Sun's argument is

that the additional claims created new issues within the meaning of Rule 38(b).[4] Yet neither the Clayton Act nor the pendent state law claim involves significantly different issues of fact[5] from the claims stated in the original complaint. The Sun's Sherman Act and Clayton Act claims share the determinative issue of whether the six hotel-casinos controlled by Summa "conspired" or were "competitors" with each other. The pendent claim and the Sherman Act claim share and hinge entirely on the absence of a legitimate business justification for Bennett's termination of the Sun advertising account. Thus, the issues in the original complaint and the amended complaint turn on the same matrix of facts. Although the Sun added new legal theories of recovery in its amended complaint, the factual allegations underlying all of its claims are that the charged corporations and individuals conspired to terminate their advertising accounts with the Sun for an anticompetitive purpose. In *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1050 (9th Cir. 1974), we held "that the presentation of a new *theory* does not constitute the presentation of a new *issue* on which a jury trial should be granted [as of right] under F.R.Civ.P., Rule 38(b)." (Emphasis in original.) We thus find that the Sun was not entitled as of right to a jury on the claims presented in the amended complaint.

Nor do we think that the district court's denial of the Sun's motion for a jury trial was an abuse of discretion. Rule 39(b) provides:

Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues.

4. Rule 38(b) states:

Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to

such issue. Such demand may be indorsed upon a pleading of the party.

5. As used in Rule 38(b), the word "issue" refers to issues of fact, not issues of law. *Trixler Brokerage Co. v. Ralston Purina Co.*, 505 F.2d 1045, 1050 (9th Cir. 1974).

"The denial of a motion made under [Rule 39(b)] is to be sustained unless an abuse of judicial discretion is shown." *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 675 (9th Cir. 1975) (quoting *Tomlin v. Pope & Talbot, Inc.*, 282 F.2d 447, 449 (9th Cir. 1960)); *Johnson v. Gardner,* 179 F.2d 114, 118 (9th Cir. 1949), *cert. denied,* 339 U.S. 935, 70 S.Ct. 661, 94 L.Ed. 1353 (1950). "For this reason appellate courts normally refuse to interfere." *Rutledge v. Electric Hose & Rubber Co., supra* at 675 (quoting *Tomlin, supra,* 282 F.2d at 449); 5 Moore's Federal Practice, 2d ed., ¶ 39.09, p. 716. We do not think interference is warranted here. The issues, particularly that of intra-enterprise conspiracy, were technical and complicated. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure, § 2334, at 120 n.49. It was within the district judge's discretion to decline to substitute jury factfinding for his own.

AFFIRMED.