James M. THOMSEN, Travis Gatus, John M. Brennan, Jerald R. Jakl, Larry R. Johnson, Anthony T. Pellegrino, individuals, Plaintiffs,

v.

WESTERN ELECTRIC CO., INC., The Pacific Telephone and Telegraph Company, American Telephone and Telegraph Company, Defendants.

C 79-2781 RPA.

United States District Court,
N. D. California.

March 30, 1981.

James Duryea, Jr., Keith & Duryea, San Francisco, Cal., for plaintiffs.

Gerald H. Genard, John N. Howarth, Paul H. White, San Francisco, Cal., for defendant Pacific Telephone.

Joe C. Creason, Jr., James B. Young, William F. Murphy, II, Pillsbury, Madison & Sutro, San Francisco, Cal., for all remaining defendants.

## OPINION AND ORDER

AGUILAR, District Judge.

This is an action in which six installers employed by Western Electric Co., Inc., (Western) claim that certain personnel policies restricting employee movement within the Bell Telecommunications System (the Bell System) violate the antitrust laws. Each plaintiff sought transfer to the Pacific Telephone and Telegraph Company (Pacific), but transfer was denied based upon the so-called "no-switching" agreements between Western and Pacific, which are discussed more fully below. Plaintiffs have brought suit under §§ 1 and 2 of the Sherman Act.

*Background.*

The record before the Court establishes the following undisputed facts. American Telephone and Telegraph Company (AT&T) is the parent company of the Bell System. The Bell System is comprised of AT&T, Western, Bell Telephone Laboratories, and twenty-three operating telephone companies, including Pacific. AT&T owns and operates connecting telecommunications lines and together with the Bell operating companies furnishes nationwide long distance service. Pacific, an 89.9% owned subsidiary of AT&T, provides telephone service within California. Western, which is wholly-owned by AT&T, manufactures telecommunications equipment for sale to the Bell operating companies, installs that equipment, and acts as a purchasing agent for the Bell System.

*Plaintiffs' Claims.*

Section 1 of the Sherman Act makes unlawful "every contract, combination . . ., or conspiracy in restraint of trade." 15 U.S.C. § 1. Section 2 of the Sherman Act renders illegal the activities of "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize . . . ." 15 U.S.C. § 2.

Plaintiffs' § 1 claim alleges that Western, Pacific, and AT&T have conspired to restrain trade or commerce by:

1. An agreement that Pacific would not consider for employment or employ any crafts employees of Western for any employment openings at Pacific;

2. An agreement that no crafts employee of Western would be hired by Pacific for a period of six months following said employee's separation from Western;

3. An agreement that no crafts employee would be hired by Pacific without Pacific first obtaining a release from Western; and

4. An agreement not to compete for each other's crafts labor force. (See Complaint at ¶ 16).

Their § 2 claim states that Western has monopolized "the manufacture, distribution, sale and installation of personal and business telephone systems in at least the states of California and Nevada." (See Complaint at ¶ 18).

*The Instant Motion.*

Defendants bring this motion for summary judgment arguing that:

1. Defendants, as one unified corporate structure, lack the ability to conspire as required by § 1;

2. Even if defendants possessed the ability to conspire, the alleged restraints are not actionable under § 1 because they are activities integral to the operation of the entire Bell System;

3. The alleged restaints affect only labor and hence are not actionable under the antitrust laws; and

4. The plaintiff employees lack standing to sue Western for monopoly offenses under § 2.

To dispose of this motion, it is only necessary that the Court discuss points 2 and 4.

*The § 1 Claim.*

 Section 1 of the Sherman Act prohibits conspiracies in restraint of trade. To prove that such a conspiracy existed, the "concerted action of distinct economic entities" must be established. *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 802 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct.

2977, 53 L.Ed.2d 1094 (1977). Although a sole actor is incapable of conspiracy, a single corporate structure which is divided into distinct economic units may possess the ability to conspire. See *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). ("[C]ommon ownership and control does not liberate corporations from the impact of the antitrust laws.") But "the mere formality of separate incorporation is not, without more, sufficient to provide the capability for conspiracy." *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 456 (9th Cir. 1977). See *Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614 (9th Cir. 1979). To determine whether there exists sufficient corporate unity to render an organization incapable of conspiracy, "a court must examine the particular facts of the case before it." *Las Vegas Sun, Inc. v. Summa Corp., supra,* 610 F.2d at 617. "To 'conspire' within the meaning of the Sherman Act, corporate entities within a single organization must be sufficiently independent of each other for their concerted action to raise antitrust concerns." *Id.* Even where a unified corporate structure has the requisite ability to conspire, however, there can be a violation of § 1 "only if the evidence shows their agreement or common action to lack a legitimate business purpose and to have an anticompetitive effect." *Murphy Tugboat v. Shipowners & Merchants Towboat,* 467 F.Supp. 841, 860 (N.D.Cal.1979). Where the alleged conspiracy is found to have a legitimate business aim, but is also claimed to render an "incidental and indirect adverse effect upon the business of some competitors," the agreement is tested under the rule of reason. *United States v. Hilton Hotels Corp.,* 467 F.2d 1000, 1003 (9th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 256 (1973). See *Las Vegas Sun, Inc. v. Summa Corp., supra,* 610 F.2d at 619.

 Since actions of affiliated companies which relate strictly to the internal operations of the common enterprise inherently have a legitimate business purpose and lack anti-competitive effects (because

they are not directed at outsiders to the corporate family), such actions cannot constitute a § 1 violation. See *Murphy Tugboat v. Shipowners & Merchants Towboat, supra,* 467 F.Supp. at 860; *In Re Penn Central Securities Litigation,* 367 F.Supp. 1158, 1166 (E.D.Pa.1973); *REA Express v. Alabama Great Southern R. Co.,* 427 F.Supp. 1157, 1166 (S.D.N.Y.1976); *Columbia Metal, Etc. v. Kaiser Alum., Etc.,* 579 F.2d 20, 34 n. 49 (3d Cir. 1978). Of course, for there to exist matters of internal management, the related companies must satisfy a threshold test of affiliation. For example, Firm A and Firm B—totally unrelated by common control or operation—could not argue successfully that a restraint effectuated by them was a matter of "internal management," for they are separate entities; their joint actions could never constitute the required "activities inherently connected with common ownership or control ...." *Murphy Tugboat v. Shipowners & Merchants Towboat, supra,* 467 F.Supp. at 860. To determine whether companies are sufficiently connected to warrant a finding that they are capable of engaging in affairs of internal management, the Court must consider the degree to which the enterprise's operations are integrated. If a basic commonality of control and operation is suggested by this analysis, the threshold criterion is met. Such a finding depends not upon any patent formula, but upon an examination of the facts of each individual case. *Cf., Las Vegas Sun, Inc. v. Summa Corp., supra.*

■ The Court finds that Pacific, AT&T and Western are sufficiently affiliated to permit the further consideration of whether the challenged activities comprised matters of internal management. In *Pacific Telephone and Telegraph Co. v. Franchise Tax Board,* 7 Cal.3d 544, 546, 102 Cal.Rptr. 782, 498 P.2d 1030 (1972), the California Supreme Court characterized the Bell system as "a group of affiliated corporations engaged in a unitary communications business." The F.C.C. has held that the Bell System is "centrally managed by AT&T and the AT&T General Department" and that "virtually all important policies and practices are centrally developed, reach[ing] all parts of the Bell System." *AT&T,* 64 F.C.C. 1, 13 n. 21 (1977). The instant record evidences further and more specific rationale to treat the three defendants as members of a unified enterprise:

1. The Bell companies file a single consolidated federal income tax return;

2. It is the corporate policy of AT&T to represent itself as one unified organization, with all correspondence, facilities, etc., displaying the common Bell System logo (equipment manufactured by Western bears the engraved legend "Bell System property");

3. Research and development of products and services is coordinated by AT&T through Bell Laboratories for the whole system;

4. Training of management and non-management personnel is routinely conducted on a system-wide basis; and

5. Western and the operating companies loan both management and nonmanagement personnel to one another on a routine basis.

Although there are other features which underline the intimate affiliation of the Bell companies, the above elements suffice to establish that AT&T, Western and Pacific are adequately related for them to have engaged in affairs of "internal management."

■ Given that the defendant companies are sufficiently affiliated for there to exist matters of internal management within their enterprise, the Court finds that the challenged restraint is protected from the dictates of § 1 because it represents "an integral part of the operation of [the Bell System] and is a legitimate concern of those who own and control it."[1] *Murphy Tugboat v. Shipowners & Merchants Towboat,*

---

1. The Court has chosen not to address the issue of whether the defendants had the ability to conspire. Assuming for the purposes of argument that defendants could have conspired, the Court has decided to focus upon whether the alleged conspiracy is actionable under § 1.

*supra,* 467 F.Supp. at 860. The conduct challenged here, the structural deployment and coordination of manpower within the Bell System, is inherent to the organization's internal management. To require that manpower decisions by the Bell companies be made totally independently, and to disallow coordination of policies among the companies, could seriously handicap operation of the Bell System.[2] "Certainly, an inflexible approach requiring competition within a single business unit, although composed of legally separate entities would introduce chaos, not promote competition." Kitner, *An Antitrust Primer,* 30 (1964). Several cases support the Court's conclusion in their recognition that despite the existence of an ability to conspire among affiliated companies the exercise of the internal management function does not represent a cause of action under § 1. In *Murphy Tugboat,* for example, the court held that pricing was an "integral part of the operation ..." and absolved two commonly owned and controlled corporations from § 1 liability. *Murphy Tugboat v. Shipowners & Merchants Towboat, supra,* 467 F.Supp. at 860. Similarly, the allocation of territories and markets among related companies in *In Re Penn Central Securities Litigation, supra,* 367 F.Supp. at 1166, was held to be "merely internal management of a single business enterprise," and not actionable under § 1. See *REA Express v. Alabama Great Southern R. Co., supra,* 427 F.Supp. at 1166; *Beckman v. Walter Kidde & Company,* 316 F.Supp. 1321 (E.D.N.Y.1970); *Syracuse Broadcasting Corporation v. Newhouse,* 319 F.2d 683 (2d Cir. 1963).

■ The internal management rule is simply a gloss upon the § 1 requirement that to be actionable, a conspiracy must lack a legitimate business purpose and have an anti-competitive effect. See *Murphy Tugboat v. Shipowners & Merchants Tow-*

*boat, supra,* 467 F.Supp. at 860; *DuPont Glore Forgan, Inc. v. AT&T Co.,* 437 F.Supp. 1104, 1115–16 (S.D.N.Y.1977). Exercise of the internal management function characteristically represents a legitimate business aim. Moreover, such activity is not anticompetitive since its internality confines any impact within the corporate family. Activities inherently connected with common ownership or control by their very definition fall outside the single instance where the conspiracy of affiliated companies would be actionable under § 1: "where the conspiracy between the related corporations involves predatory or coercive conduct directed toward outsiders." Von Kolinowski 16 *Business Organizations: Antitrust Laws and Trade Regulation,* § 6.01[2], 6–37 (1980). See *Report of the Attorney General's National Committee to Study the Antitrust Laws* (1955) p. 34 ("Nothing [in the Supreme Court decisions] should be interpreted as justifying the conclusion that concerted action solely between a parent and a subsidiary or subsidiaries, the purpose and effect of which is not coercive restraint of the trade of strangers to corporate family, violates § 1.") *Cf. Chastain v. AT&T Co.,* 401 F.Supp. 151 (D.D.C.1975) (where the alleged conspiracy involved the Bell System's actions toward customers and competitors). The deployment and coordination of personnel within the Bell System were internal affairs, and not predatory practices. Hence, since the challenged restraints had legitimate business purposes and lacked anticompetitive effects, by virtue of their status as activities inherently connected with common ownership and control of the corporations, summary judgment on the § 1 claim must be granted.

*The § 2 Claim.*

■ A plaintiff lacks standing to sue in antitrust unless his alleged injury fell

---

**2.** "[C]ommon ownership or control of corporations will inevitably bring about communications, understandings, and common actions among them in areas reached by Section 1 such as production, distribution, and price. Indiscriminate application of Section 1 to commonly owned or controlled corporations could there-

fore have absurd and counterproductive results, subjecting them to liability for 'an automatically self-proving conspiracy' on account of activity necessarily arising out of or inherently connected with common ownership or control." *Murphy Tugboat v. Shipowners & Merchants Towboat, supra,* 467 F.Supp. at 860.

within the "target area" of defendant's conduct. See *In re Multidistrict Vehicle Air Pollution M.D.L. 31*, 481 F.2d 122 (9th Cir. 1973), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). ". . . Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262–63, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972). Where the alleged unlawful conduct is only remotely connected to the injury claimed by plaintiff, standing is to be denied. See *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977). It is well settled within the Ninth Circuit that employees lack standing to sue their employer under § 2 of the Sherman Act unless the labor or employment market was the target of the alleged violation. See *Gutierrez v. E. & J. Gallo Winery Co., Inc.*, 604 F.2d 645 (9th Cir. 1979); *Contreras v. Grower Shipper Vegetable Assn. of Central Cal.*, 1971 CCH Trade Cases ¶ 73,592, p. 90,452, *affirmed per curiam*, 484 F.2d 1346 (9th Cir. 1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974); *Solinger v. A&M Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978), *cert. denied*, 441 U.S. 908, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). Standing in such instances is denied because "[t]he alleged conduct of the defendant, in its relation to these plaintiffs, is too remote . . ." *Gutierrez v. E. & J. Gallo Winery Co., Inc., supra*, 604 F.2d at 646. See *Conference of Studio Unions v. Loew's, Inc.*, 193 F.2d 51 (9th Cir. 1951).

■ The above principle requires the Court to deny plaintiffs' standing to sue Western for its alleged monopolization of "the market for manufacture, distribution, sales, and installation" of telephone systems. (See Complaint at ¶ 18). Plaintiffs' § 2 claim refers not to the labor market, but to a product market. Hence, Western's employees were not the target of the alleged violation. They did not compete with Western or purchase from it. Any injury they suffered "was merely incidental to the alleged antitrust violation and was not within the area of the economy that the defendant should have foreseen would be affected by its violation." *Solinger v. A&M Records, Inc., supra*, 586 F.2d at 1312. Accordingly, plaintiffs, as employees who fall outside the target area of the alleged violations, lack standing to sue under § 2.

*Conclusion.*

■ Careful examination of the record reveals no facts to support plaintiffs' claims that defendants violated § 1 of the Sherman Act. Plaintiffs' "version of the facts [fails to] support a viable legal theory which would entitle them, if accepted, to a judgment as a matter of law." *Mutual Fund Investors v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir. 1977). See *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 672 (9th Cir. 1980) ("Summary judgment may be properly granted in an antitrust action on an allegation of conspiracy where there are understandable and legitimate business reasons for a defendant's conduct.") Although the Court is well aware that summary procedures in antitrust actions are to be exercised cautiously, in "the absence of any significant probative evidence tending to support the complaint," a defendant's motion for summary judgment should be granted. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

Neither is the Court persuaded that the plaintiffs have standing to sue under § 2 of the Sherman Act.

Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment on plaintiffs' claims is granted.