

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-15-00368-CV
_____

KENNETH L. HAEDGE, DALE C. TIPPIT, DENVER TIPPIT, CASE S. JONES, AND
CLINTON H. SHED, APPELLANTS

V.

CENTRAL TEXAS CATTLEMEN'S ASSOCIATION, APPELLEE

On Appeal from the 52nd District Court
Coryell County, Texas
Trial Court No. DC-15-43362, Honorable Trent D. Farrell, Presiding

October 11, 2016

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Appellants, Kenneth L. Haedge, Dale C. Tippit, Denver Tippit, Case S. Jones, and Clinton H. Shed, appeal the trial court's judgment by which they were denied all relief in their claims against Central Texas Cattlemen's Association (CTCA) and individual members of CTCA's Board of Directors. On appeal, appellants complain that the trial court erroneously denied them their right to a jury trial on certain issues. They also contend that the trial court improperly applied the doctrine of judicial non-intervention in its various rulings. We will affirm.

Factual and Procedural History

When the United States Department of the Army created Fort Hood, it acquired approximately 197,000 acres of Central Texas land that had been used, in part, for cattle grazing. As a means of compromising with and compensating the families whose land was taken, the United States granted to those families the right to graze cattle on that land so long as the grazing was not in conflict with the needs of the Army.

About ten years later, in 1953, those families formed a non-profit corporation to represent their joint interests in grazing cattle on Fort Hood; this corporation was the CTCA, and the cattle grazing rights were allocated to the member families by the issuance of shares in the CTCA commensurate with each family's rights acquired when their land was condemned to form Fort Hood.[1] CTCA holds a cattle-grazing lease of the land with the Army which permits the CTCA to graze 2000 head of cattle on that land.[2] CTCA membership is voluntary and, as the arrangement appears to be, the grazing rights belong to CTCA; in other words, per the relationship between the Army, CTCA, and CTCA members, it is a person's membership in CTCA that gives the member the right to graze cattle on Fort Hood land.

In furtherance of their cattle grazing ventures, CTCA members must erect temporary pens to gather their cattle from time to time. In furtherance of its military training, from time to time, the Army conducts a variety of training exercises, including weapons training, on the land. And it is at the intersection of these pursuits that the

---

[1] Originally incorporated in 1953, CTCA's original charter was revoked in 2009. That same year, a new charter and restated articles of incorporation were filed and CTCA was reincorporated.

[2] Each CTCA share gives the member the right to graze 1.6 head of cattle.

conflict at issue here arises concerning the location of the temporary pens that appellants erected in contravention to the applicable rules and provisions.

CTCA is governed by bylaws and resolutions enacted by its Board of Directors. In particular, as a result of an internal conflict concerning appellant Tippit's pens, on April 11, 2011, the Board passed a resolution "that any trap pens to be put in impact [zone] must be approved by the board, and the shareholder responsible for [the] pen must coordinate and get written permission from Ft. Hood Range Control." CTCA bylaws outline potential consequences for members who violate the rules, those consequences ranging from fines to share cancellation under certain circumstances. Article XXI of the CTCA bylaws provides that "[t]he Board of Directors, for good cause, may cancel a member's shares in the Association without compensation to the members for such shares." Section 2 of Article XXI defines "good cause" to include "[v]iolation of the Articles of Incorporation, By-laws, or other rules and regulations of the Association" and "performance of any act which has or may have the tendency to injure, damage, or in any way affect the Association's business relationship with the Department of Army, including the Lease."

The CTCA bylaws, the lease between the CTCA and the Army, and federal regulations all recognize that, while the Army allows cattle grazing, the land is still a military area and, with that, comes a certain understanding that some areas will be more restricted due to safety concerns. One type of area generally does not involve live fire exercises, and building of temporary pens is less restricted. Another type of area is the approximately 66,000-acre "Impact Area." The Impact Area is further divided into two other designated areas: (1) "Live Fire" areas in which the Army conducts live fire

3

exercises and (2) the "Permanently Dudded" area (PD-94), an area consisting of approximately 10,000 acres within the Impact Area throughout which large caliber military fire is impacted. PD-94 is a highly restricted area because unexploded heavy ordnance "is saturated at such a level that they don't feel it's safe for people to be in and out of that area on a regular basis." CTCA members are supposed to contact the Army's Range Control Office at Fort Hood to gain entry to the land generally and to access restricted areas. In most instances, CTCA members were required to get permission from Range Control to erect any kind of temporary pens on the land.

There is some evidence that CTCA members did not always strictly adhere to the procedure for gaining access to the restricted areas. On this particular occasion, the record indicates, appellant Haedge sought permission from the Board in November 2014 to build temporary pens in two locations on Fort Hood: Lone Mountain and Potters. The Lone Mountain location was in the Live Fire section of the Impact Zone, and Potters was located in PD-94. Although the Board was aware that Range Control would likely deny permission to build pens in these locations, it approved the proposed pen placements contingent on the Army's written approval of the same, consistent with the April 11, 2011 resolution on the matter.

Sometime later, in December 2014, Haedge contacted Greg Simpson of Range Control. Haedge sought permission to erect the pen at Potters but did not ask for permission to build at Lone Mountain. Because Potters was in PD-94, Simpson denied permission to build a pen at Potters and offered an alternative location about one mile away just north of an area known as Sugarloaf Mountain that would lie outside PD-94. The conversation between Haedge and Simpson resulted in no permission from Range

4

Control to build pens at Lone Mountain and Potters, and, as it turned out, no one did build pens in those locations or at the alternate location.

Instead, Haedge, joined by the other appellants at different times and in different capacities, decided to build pens at two other locations—House Creek and Altum Field—both being miles from the locations mentioned to the Board and the locations discussed with Range Control. Altum Field was squarely within PD-94 and was three miles from any of the other mentioned locations. The House Creek area was located in the Live Fire zone of the Impact Area. Ultimately, those pens were built with the help of some heavy equipment to move around scorched trees and earth potentially full of unexploded ammunition but without any discussion with either the Board or Range Control. Haedge testified that he did not disclose the locations at which he wanted to build pens and instead "deliberately concealed" the intended pen locations because he knew both the Board and Range Control would refuse permission to put pens in these two locations. In fact, Range Control had denied permission to three other CTCA members who had properly sought permission to build pens in that area. Haedge also admitted that, when the group called in to Range Control to gain access to the land in general, they told Range Control that the group was planning on going to an area known as McBride, a far less restricted area at which a permanent pen has been built, when they intended, instead, to go to Altum Field.[3]

When the pens were discovered, Army Range Control contacted CTCA President Brandon Belt who was in contact with Range Control, Texas Game Wardens,

---

[3] There is evidence that Haedge did, at least, call into Range Control to get permission to *enter* the restricted Live Fire area known as House Creek but, again, not to *build pens* in that area or in Altum Field.

and other CTCA members trying to find out more about the pens' exact locations and the responsible parties. Belt and another Board member met with Range Control officers toward the end of December shortly after discovery of the pens and promised Range Control that the CTCA Board would investigate the matter and would meet to consider appropriate action. Belt contacted a number of CTCA members to try to learn more information. On January 7, 2015, Belt again met with Range Control to sort out information and misinformation from what Range Control had learned and attempt to reconcile some of what Belt had heard in his discussion with members indicating that Simpson from Range Control had given permission for the pens, which Belt learned was not at all the case.

Shortly after this meeting, K.T. Botkin, a Board member, who had also learned of the pen in Altum Field on PD-94, called an impromptu meeting of some Board members to update some members on the development and find out more about what had happened. At that meeting, Belt also relayed to other Board members that Range Control had contacted him and that Range Control "was upset" about the ordeal. Belt testified that Eric Harmon, head of Range Control, "was thoroughly pissed" that the pen was put up in Altum Field when Range Control had been very clear about putting up pens in that area. Belt testified that Harmon said to him that, if CTCA cannot control its members, then the Army will have to do something. After discussing with other CTCA members and referring to Range Control records of members who had been out on the land in the applicable timeframe, the Board identified those members it considered

responsible for building the pens in the restricted areas.[4]  Belt and Botkin spoke directly with the members suspected of having been involved in the construction of the pens.

In response to this violation, the Board called a special meeting at which the Board was to consider the matter.  The Board sent a letter to all CTCA members informing each of the purpose of the meeting.  The Board also sent a notice to each of the members accused in this matter that provided as follows:

> Pursuant to the By-Laws of the Central Texas Cattlemen's Association, as adopted on May 19, 2009, you are hereby notified that a Special Meeting of the CTCA Board of Directors has been called for January 19, 2015, at 7:00 p.m. in the Coryell County Annex Courtroom in Gatesville, Texas.
>
> This notice is being provided to you in accordance with the By-Laws because a complaint has been made against you.  The complaint alleges that you have violated the CTCA By-Laws, violated the rules and regulations of the CTCA, engaged in actions that bring embarrassment to the CTCA, engaged in action that puts the CTCA in jeopardy of losing the Lease, and/or performed acts which have or may have the tendency to injure, damage, or affect the CTCA's business relationship with the Department of Army.
>
> As a result of the complaint, a hearing will be had at the Special Meeting of the Board of Directors on January 19, 2015, to determine if the complaint is valid, and if valid, whether good cause exists to take action against you under the CTCA By-Laws.  The Board may make financial assessments against you, or cancel your shares, as a result of your action, under CTCA By-Laws; Article XX & XXI.
>
> **This is your notification that the Board will be considering action at the Special Board Meeting on January 19, 2015, at 7:00 p.m. to include special and specific assessment and/or cancellation of your shares**.

The special meeting was held at said place and time.  Appellants were present and were given the opportunity to respond, which, it appears from the recording of that

---

[4] We note that both the record and the parties' briefing indicates that appellant Dale Tippit was not personally present when the pens were being built, but his son and grandson were present as was Dale Tippit's registered agent, who was also his brother-in-law and referred to as his "hired hand."

meeting, most did. At the end of the hearing, the Board voted nine to four in favor of a motion made to cancel appellants' shares in CTCA.[5]

Appellants filed suit against CTCA and the individual Board members, alleging causes of action for fraud, conversion, and breach of contract against CTCA and a cause of action for defamation against individual CTCA Board members. Appellants sought declaratory relief that CTCA bylaws were void as against public policy and injunctive relief prohibiting CTCA from taking any action as to appellants' shares. CTCA and the individual Board members filed a Joint Traditional and No-Evidence Motion for Summary Judgment, urging that the doctrine of judicial non-intervention applied to the dispute at bar and served to limit the trial court's jurisdiction over the matter to a review of whether the appellants were afforded due process.[6]

The trial court granted appellees' joint motion for summary judgment, concluding that the only issue remaining before the court was whether the appellants were afforded due process in the manner by which their shares were cancelled. After a trial to the bench on the narrowed issue, ultimately, the trial court entered judgment that appellants take nothing by their suit.

On appeal, appellants complain that the trial court improperly denied them a jury trial as to several fact questions that, they contend, were crucial to the trial court's due process inquiry. In their second point of error in which two related issues are raised as

---

[5] Haedge had ninety-six shares; Dale Tippet had sixty-four shares; Shed had sixty-four shares; Denver Tippet had sixty-four shares; and Jones had thirty-seven shares.

[6] Appellees also urged that the doctrine applied to limit *the issues pending* before the trial court—rather than the court's jurisdiction—to only one inquiry: whether appellants were afforded due process. As we will see, there has been some disagreement concerning the precise nature of the analysis applicable when the doctrine of judicial non-intervention is considered applicable. *See infra.* p. 11.

to the trial court's application of the doctrine of judicial non-intervention, appellants also contend that the trial court improperly granted summary judgment based on the doctrine, thereby improperly limiting the issue at the trial to the bench. Finally, appellants contend that the trial court improperly applied the doctrine of judicial non-intervention to dismiss the claims against the individual defendants in this case. To facilitate a clearer analysis, we will address the application of the doctrine of judicial non-intervention first so that we can better understand the foundation of the trial court's rulings in their proper context.

## Application of Doctrine of Judicial Non-Intervention

Appellants complain that the trial court improperly applied the doctrine of judicial non-intervention, sometimes also called the doctrine of judicial non-interference. In doing so, appellants maintain that the trial court (1) erroneously granted a summary judgment based on the doctrine and, therefore, erroneously truncated the issues reserved for trial on the merits, and (2) erroneously dismissed claims against the individual Board members based on the doctrine.

<u>Applicable Law</u>

Texas courts do not generally exercise jurisdiction over the affairs of voluntary non-profit associations. Historically, this reluctance is called the doctrine of judicial non-intervention and is stated as follows:

> Courts are not disposed to interfere with the internal management of a voluntary association. The right of such an organization to interpret its own organic agreements, its laws and regulations, after they are made and adopted, is not inferior to its right to make and adopt them. And a member, by becoming such, subjects himself, within legal limits, to his

9

organization's power to administer, as well as to its power to make, its rules. To say that the courts may exercise the power of interpretation and administration reserved to the governing bodies of such organizations would plainly subvert their contractual right to exercise such power of interpretation and administration. So long as such governing bodies do not substitute legislation for interpretation, do not transgress the bounds of reason, common sense, fairness, do not contravene public policy, or the laws of the land in such interpretation and administration, the courts cannot interfere. Without such latitude of action, associations organized to promote the legitimate welfare of its members would be deprived of power to do so.

*Bhd. of R.R. Trainmen v. Price*, 108 S.W.2d 239, 241 (Tex. Civ. App.—Galveston 1937, writ dism'd w.o.j.) (internal citation omitted).

Despite this general rule, courts may interfere in the inner-dealings of a private association if a valuable right or property interest is at stake. *See Hatley v. Am. Quarter Horse Ass'n*, 552 F.2d 646, 655 (5th Cir. 1977) (citing *Masonic Grand Chapter of Order of E. Star v. Sweatt*, 329 S.W.2d 334, 337 (Tex. Civ. App.—Fort Worth 1959, writ ref'd n.r.e.)); *Owens Entm't Club v. Owens Cmty. Improvement Club*, 466 S.W.2d 70, 72 (Tex. Civ. App.—Eastland 1971, no writ). Courts have held that associations must accord their members something similar to due process and have intervened in the internal affairs of associations on this ground. *Stevens v. Anatolian Shepherd Dog Club of Am., Inc.*, 231 S.W.3d 71, 75 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Hatley*, 552 F.2d at 655; *Sweatt*, 329 S.W.2d at 337; and *Price*, 108 S.W.2d at 241). The essential elements of due process applicable here are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case. *See Adams v. Am. Quarter Horse Ass'n*, 583 S.W.2d 828, 834 (Tex. Civ. App.—Amarillo 1979, writ ref'd n.r.e.); *Sweatt*, 329 S.W.2d at 337. "Courts have defined due process in this context to be minimal." *Barrash v. Am. Ass'n of Neurological Surgeons, Inc.*, No. 4:13-cv-1054, 2014 U.S. Dist. LEXIS 70947, at *4 (S.D. Tex. 2014).

10

The doctrine of judicial non-intervention is a well-established principle in Texas law. *See Harden v. Colonial Country Club*, 634 S.W.2d 56, 60 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.). However, the application and the impact of the doctrine and its exceptions have not always been predictable. *See Barrash*, 2014 U.S. Dist. LEXIS 70947, at *2 (observing "the lack of clear guidance from Texas case law" on the topic of proper disposition of claims when doctrine of judicial non-intervention is asserted); *Hatley*, 552 F.2d at 655 (noting that "the fabric of Texas law is not all of one piece in this area"); *see also Stevens*, 231 S.W.3d at 75 (disagreeing with the approach taken by many Texas courts that treats the doctrine of judicial non-intervention as a mechanism by which courts are deprived of subject-matter jurisdiction, treating the doctrine, instead, as one in which courts decline "to exercise jurisdiction more for various policy reasons such as judicial economy").[7]

Standard of Review

As might be expected when Texas courts treat the doctrine inconsistently, there are some conflicting statements regarding the standard of review to be applied to a trial

---

[7] Further illustrating the confusion between the generally accepted principles of the doctrine and the application of those principles, the *Barrash* court has observed as follows:

> The Court must reconcile these rules with the oft-quoted "exception" to the doctrine of judicial non-intervention. As commonly phrased, the exception permits judicial intervention when the organization has "substitute[d] legislation for interpretation;" "transgress[ed] the bounds of reason, common sense, fairness;" or "contravene[d] public policy, or the laws of the land." *Price*, 108 S.W.2d at 241; *see also* [*Dallas Cty. Med. Soc'y & State Med. Ass'n v. Ubinas-Brache*, 68 S.W.3d 31, 41 (Tex. App.—Dallas 2001, pet. denied)]. Because no court has ever found the exception to be met, it is unclear what type or types of claims it authorizes. However, one Texas appellate court has intimated that the exception permits a due-process-type review only. *See Burge v. Am. Quarter Horse Ass'n*, 782 S.W.2d 353, 355–56 (Tex. App.—Amarillo 1990, no writ) (acknowledging the exception to the judicial non-intervention doctrine and later concluding that "we believe the process of registration and cancellation of registration [of a quarter horse] to be an integral part of the [organization's] internal management with which the courts will not interfere in the absence of deprivation of due process.").

*Barrash*, 2014 U.S. Dist. LEXIS 70947, at *7–8.

court's decision that the doctrine should apply to a given case. See *Stevens*, 231 S.W.3d at 75–76. Courts that have treated the doctrine as a mechanism by which a court is deprived of jurisdiction tend to apply a de novo standard of review as is typically proper when application of a jurisdictional rule is under review. *See Tex. Thoroughbred Breeders Ass'n v. Donnan*, 202 S.W.3d 213, 223–24 (Tex. App.—Tyler 2006, pet. denied); *Juarez v. Tex. Ass'n of Sporting Officials El Paso Chapter*, 172 S.W.3d 274, 277–78 (Tex. App.—El Paso 2005, no pet.). The Houston-Fourteenth Court took issue with this characterization of the doctrine and the attendant standard of review, maintaining, instead, that an abuse-of-discretion standard of review should apply because the doctrine involves questions of policy, weighing of competing factors, and the exercise of discretion when deciding whether to exercise jurisdiction over a dispute. *See Stevens*, 231 S.W.3d at 75–76 (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000), for the proposition that this standard is especially appropriate when the trial court must weigh competing policy considerations and balance interests). As the *Stephens* court pointed out, several other cases examining the doctrine have failed to clearly state the applicable standard. *See id.* at 75. Agreeing in large part with the *Stephens* court's understanding of the principles underlying the doctrine, we will review the trial court's decision regarding the applicability of the doctrine of judicial non-interference for an abuse of its discretion. *See id.* at 75–76.

Analysis

Having studied the various iterations of the doctrine and its exceptions, we conclude that the issues presented to the trial court and to this Court are in the very nature of the matters the doctrine advises us to decline the opportunity to pass on. *See*

*Whitmire v. Nat'l Cutting Horse Ass'n*, No. 02-08-00176-CV, 2009 Tex. App. LEXIS 5712, at *15 (Tex. App.—Fort Worth July 23, 2009, pet. denied) (mem. op.) (concluding that appellate complaints concerning declaratory relief, breach of contract, fraud, and negligent misrepresentation in case involving membership suspension were "exactly the type of complaints in which Texas courts have declined to intervene"); *Donnan*, 202 S.W.3d at 225 (concluding that "this case [involving injunctive relief, libel, slander, and negligence in horse accreditation dispute] is exactly the type of internal dispute that the courts of this state have declined to oversee"). That being so, we will not substitute our adjudicative process for the decision-making process of the CTCA Board of Directors, which was charged with such matters and to which CTCA members submitted those matters by their membership. *See Harden*, 634 S.W.2d at 60. Appellants, having voluntarily become members of the CTCA, agreed to be bound by its determinations:

> A member of a voluntary association is bound by a sentence of expulsion against him lawfully rendered by a tribunal created in pursuance of its constitution and clothed with that power. The rule also applies at least to such incorporated societies as are not organized principally for commercial gain. By uniting with the society the member assents to and accepts the constitution and impliedly binds himself to abide by the decision of such boards as that instrument may provide for the determination of disputes arising within the association. The decisions of these tribunals, when organized under the constitution and lawfully exercising their powers, though they involve the expulsion of a member, are no more subject to collateral attack for mere error than are the judgments of a court of law.

*Screwmen's Benevolent Ass'n v. Benson*, 13 S.W. 379, 380 (Tex. 1890).[8] The trial court did not abuse its discretion by concluding that the doctrine of judicial non-

---

[8] The Texas Supreme Court continued as follows:

But if the tribunal act illegally—if it declare a sentence of expulsion for an offense for which that penalty is not provided by the constitution and laws of the association, and if there be no right of appeal within the association reserved for the redress of the injury, the courts will review the proceedings, and if found illegal will treat them as null, and

13

intervention applied to the dispute before it such that it declined to exercise jurisdiction to re-adjudicate the internal dispute concerning the proper disciplinary measure for the appellants' violations of the rules and regulations.

Because, however, there appears to be a valuable property right at issue, we do believe the trial court was reasonable to apply the doctrine of judicial non-intervention in such a way that it narrowed the only issue before it as one concerning whether the affected members received minimal due process before they were deprived of that property right. We will review that issue and proceed under the conclusion that the CTCA was required to provide its members with minimal due process before acting to cancel the offending members' shares. We will review de novo the trial court's conclusion on the question of law regarding whether the members were afforded due process. See *Granek v. Tex. State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 771–72 (Tex. App.—Austin 2005, no pet.).

What the record shows is that the group of appellants, again in various capacities, blatantly disregarded the lease provisions, Board rules, federal regulations, and common sense by erecting pens in these restricted areas, areas for which permission was intentionally not sought because they knew it would be denied. We learn that the group seems to have intentionally misled the Army's Range Control officers by seeking permission to build the pens elsewhere all the while intending to build them in the areas for which they knew permission would be denied. The Army

---

restore the member to his privileges as such . . . . If his expulsion was illegal, and if the association had refused, upon appeal, to set it aside, it may be that this court would have granted redress.

*Id.* So, it appears that, even as early as 1890, there was an exception to this general principle of respecting a voluntary association's autonomy.

was rather displeased it would seem, and the CTCA Board was unhappy and worried about the Army's reaction. The Board addressed the violation and the developing conflict over it.

CTCA's handling of the matter was an internal matter. Was the violation blatant? It would certainly seem so. Was the resulting cancellation harsh? Indeed, it would seem so as well. Nonetheless, the CTCA Board was the body charged with the decision: "Whether the policy be wise, be in the best interest of its membership, or be acceptable to the court are not questions justifying the interposition of judicial action." *Mid-West Elec. Coop., Inc. v. W. Tex. Chamber of Commerce*, 369 S.W.2d 842, 844 (Tex. Civ. App.—Waco 1963, no writ).

Focusing on whether appellants were afforded due process throughout CTCA's handling of the matter, we see that CTCA provided notice to the affected members, citing its bylaws. The notice of the hearing alerted the members that a complaint had been made that they had violated the corporate bylaws and that a meeting would be held to determine the validity and consequences, if any, of the complained-of action. Appellants' conduct violated, *inter alia*, CTCA bylaws by damaging or risking damage to the relationship between CTCA and the Army. Notice and hearing was provided per CTCA bylaws. And cancellation of shares was a consequence provided for in CTCA bylaws. The record shows that all the appellants were present at that hearing and acknowledged having notice of the topic and possible consequences. That those consequences were ultimately much more drastic than they expected does not alter the fact that the action was taken after appellants were afforded due process consistent with the internal governing structure within the CTCA.

15

Additionally, that there may have been other violations of the bylaws, regulations, or lease provisions in the past that did not result in cancellation does not necessarily mean that the members here were denied due process.  We do not have before us the details concerning those alleged violations, nor do we know with certainty what was done in response to those alleged violations.  It is quite possible that what we have here is a series of violations and a pattern of disregard for the rules governing entry onto the land that finally culminated in this rather blatant violation of not simply unauthorized entry but also unauthorized building of temporary pens in a location rightly regarded as dangerous, at which point the Army became extremely upset.  This development, in turn, concerned the other CTCA members, including the Board of Directors, because the Army's view of the violation and its attitude toward the arrangement could jeopardize the grazing rights of all the CTCA members.  Again, we cannot adjudicate the propriety of CTCA's handling of those other alleged violations and any (non)action in response to them.

Much like the *Hatley* court, we focus our attention on whether there was "[a] procedural lapse, not a substantive defect" in the process that must be condemned in this case.  *See Hatley*, 552 F.2d at 658.  Appellants' complaints appear to focus on substantive defects by attacking the CTCA Board's decision to consider the violation valid and cancel the members shares as a result—an internal determination, one following notice and hearing consistent with CTCA bylaws, the merits of which we do not pass on and will not review.

In the same vein, the trial court did not err by granting summary judgment in favor of the individual Board members who voted in favor of cancellation.  Generally, a

16

corporate officer's acts on the corporation's behalf are deemed the corporation's acts. *See ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997); *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). Appellants maintain that, by voting in favor of cancellation of appellants' shares, the Board members acted contrary to CTCA's best interest and, instead, served only their own personal interests. *See Holloway*, 898 S.W.2d at 796.[9]

Actions taken by appellants angered the Army and, in the opinion of at least some Board members, ran the risk of jeopardizing the CTCA's relationship with the Army, including the cattle-grazing lease which, of course, was crucial to the CTCA and its members. There is no evidence that the CTCA Board members who voted in favor of cancelling shares were acting in a manner so contrary to the CTCA's best interest that their actions could only have been motivated by personal interest, as appellants contend. *See id.*

The record reveals no evidence that any exception to the general rule applies such that the individual Board members would be subject to personal liability. That being so, the members who voted in favor of cancellation performed a corporate act, and the trial court properly implemented the doctrine of judicial non-intervention to that act and declined appellants' invitation to review the substance of it. We find no merit in the second issue raised in appellants' second point of error. We overrule appellants' second point of error in its entirety.

---

[9] We pause only to note that this language and this authority is the generally accepted standard when examining the personal liability of a corporate officer for tortious interference with contract.

Denial of Right to Trial by Jury

Citing the general rule that a party is entitled to have a jury resolve the disputed fact issues, appellants complain in their first issue that the trial court denied them their right to a trial by jury on the factual issues surrounding their claim for equitable relief after the trial court disposed of most of appellants' claims by way of summary judgment. *See DiGiuseppe v. Lawler*, 269 S.W.3d 588, 596 (Tex. 2008). Appellants contend that they were entitled to a jury trial on certain fact issues they consider a crucial part of the due process inquiry.

Analysis

By its summary judgment, the trial court concluded that the only issue before the court was the issue of due process because the doctrine of judicial non-intervention applied to the matter.[10] Claims regarding deprivation of constitutional rights such as due process present questions of law. *See Granek*, 172 S.W.3d at 771–72. In this context, "[a]ll that due process requires is that a party be given notice of the time and

---

[10] Further, concentrating solely on the issue as presented, as one focused on the trial court's denial of appellant's request for a jury trial, we note the following comment from appellants' counsel as having occurred after the trial court's ruling on summary judgment:

> I believe that – if I understand the Court's ruling, what the Court intends to try is the declaratory judgment issue, the due process issue, the issue of attorneys' fees, and equitable relief. If that's correct, then it appears to me that every single bit of that is a question for the Court, and I don't really see a jury issue that is necessary to be decided. I don't want to waive my rights to a jury, but it appears as though these are all, for the most part, questions for the Court. The attorneys' fees and declaratory judgment is a question of whether the Court finds it equitable and just and, in your discretion, to award those. We'd be willing to submit those as well to the Court as opposed to the jury, and it might make the whole process go a lot faster.

The invited error doctrine applies to such a situation in which a party requests the trial court to make a specific ruling or acquiesces to such, then complains of that very ruling on appeal. *See In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (orig. proceeding). A party cannot complain on appeal that the trial court took a specific action that the complaining party requested. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex. 2005) (per curiam). The record indicates that appellants, at a minimum, acquiesced to submission of the remaining issues to the bench.

substance of the hearing, and an opportunity to present arguments at the hearing." *See Dueitt v. Arrowhead Lakes Prop. Owners, Inc.*, 180 S.W.3d 733, 738 (Tex. App.—Waco 2005, pet. denied).

The process appellants received here is undisputed. Appellants were provided notice and attended the hearing at which the matter was addressed. That many of the members later wished that they would have retained counsel prior to the hearing but did not do so because they did not expect that their shares would be cancelled does not affect the fact that appellants were provided notice and a hearing consistent with minimal due process. The issues appellants advance as central to the due process inquiry are not so; those issues invited the trial court, and invite this Court now, to delve into the internal management of CTCA and evaluate the propriety of the CTCA Board's decision, which we have declined to do. With that said, when the facts concerning the process that was provided are undisputed, as here, the question of due process is one of law for the trial court rather than one of fact for a jury. *See Granek*, 172 S.W.3d at 771–72.

So, if the trial court was correct in concluding that the doctrine of non-intervention applied to the case before it in such a way that the only issue remaining is a question regarding whether due process was afforded the appellants, then the trial court was correct in denying the jury trial because whether the process afforded appellants satisfied the minimal due process applicable here was a question of law when, without dispute, the record demonstrates the process that appellants received. As we have outlined above, we conclude that the trial court's application of the non-intervention doctrine was, indeed, proper. We overrule appellant's first point of error.

Conclusion

Having overruled appellants' points of error on appeal, we affirm the trial court's judgment.  *See* TEX. R. APP. P. 43.2(a).

                                        Mackey K. Hancock
                                        Justice